**Jeetendra BHANDARI,**
**Plaintiff-Appellant,**

v.

**FIRST NATIONAL BANK OF COMMERCE, Defendant-Appellee.**

No. 85–3445.

United States Court of Appeals,
Fifth Circuit.

Oct. 5, 1987.

Patrick E. Higginbotham, Circuit Judge, filed specially concurring opinion.

Reavley, Circuit Judge, with whom Politz, Randall, Johnson, Jerre S. Williams, and Eugene Davis, Circuit Judges, joined, filed dissenting opinion.

Murov & Ward, Mark G. Murov, Rita K. Ward, New Orleans, La., for plaintiff-appellant.

James B. Irwin, Catherine Kirgis Simpson, Marta Alison Richards, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, La., for defendant-appellee.

John T. Nockleby, Senior Litigation Atty., Maldef, E. Richard Larson, Los Angeles, Cal., for Amicus-Mex-Am. Legal Defense.

Dando B. Cellini, Bennet S. Koren, Susan E. Santiago, McGlinchey, Stafford, Mintz, Cellini & Lang, New Orleans, La., for amici-Consumer Bankers/Louisiana Bankers, etc.

Before CLARK, Chief Judge, GEE, RUBIN,[*] REAVLEY, POLITZ, RANDALL, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, HILL, and JONES, Circuit Judges.

GEE, Circuit Judge:

The appellee bank denied appellant Jeetendra Bhandari credit partly because he was, although a lawful permanent resident of the United States, not a citizen. In the ensuing lawsuit, the district court held that 42 U.S.C. § 1981 gave no remedy for discrimination against aliens by private persons, deciding, as well, other questions not pertinent here. It did so despite our contrary decision in *Guerra v. Manchester Terminal Corp.*, 498 F.2d 641 (1974), because it believed that *Guerra* had been wrongly decided and was no longer good law.[1] A panel of our court reversed, 808 F.2d 1082; and we took the appeal en banc to resolve the issue—a vexed and difficult one of its very nature, rendered more urgent by recent developments in Immigration Law familiar to anyone likely to read these words.

The question is whether in this day and time we should link together inseparably the legal protections accorded all persons against race-prejudice by their fellows in our society with those accorded the foreign nationals among us against alienage discrimination. Reflection persuades us that they would be curious mates in harness: the impulses that might move Smith, a white United States citizen, say, to discriminate against Jones, a black United States

---

[*] Judge Rubin stood recused and did not participate in this cause.

1. The district court cited *Bobo v. ITT, Continental Baking Co.*, 662 F.2d 340, 344 (5th Cir.1981) and *Campbell v. Gadsden County District School Board*, 534 F.2d 650, 653–54 n. 8 (5th Cir.1976) as casting *Guerra* in question.

citizen, are unlikely, we think, to bear much in common with those which might move him to discriminate against Kirov, a Ukranian citizen of the U.S.S.R. legally resident in this country—let alone against Lopez, an illegal Mexican immigrant. Yet § 1981, which commences with the phrase "All persons within the jurisdiction of the United States," applies equally to Jones, Kirov and Lopez, if given its broad, literal meaning. It has been said that there is no greater injustice than to treat unequal things equally,[2] and we are not disposed to do so in this instance unless the Congress has clearly demanded it. This it has not done in the instance of § 1981, a statute of all but Constitutional sweep and breadth; and, for the reasons that follow, we decline to yoke § 1981's protections against alienage discrimination to those against discrimination on racial grounds.

### The Statute and Its History

Section 1981 declares:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, to be parties, give evidence, and to the full and equal benefits of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Since 1968, when the Supreme Court, in *Jones v. Alfred Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189, commenced recalling the Civil War Rights Statutes into service after a century's desuetude, countless words and endless energy have been expended by courts, including the Supreme Court, in attempts to assign meaning and rational limits to these broad and majestic enactments. The extreme difficulty of this task stems in great part from the Court's initial rejection, in *Jones*, of what seems the natural interpretation of § 1981: that it directs States and Territories to grant each and every group of humans, no matter how defined or classified, the same rights in their *courts* and under their *laws* as they grant white citizens—no more, no less. If this natural construction be rejected, another is not easily found, much as though a student had been told that any answer was acceptable as the sum of two plus two except four and directed to find another suitable one.[3] Four members of the Court have since expressed varying degrees of disagreement with this rejection, see *Runyon v. McCrary*, 427 U.S. 160, 186–214, 96 S.Ct. 2586, 2602–2615, 49 L.Ed.2d 415 (1976); but it of course forecloses the acceptance of any such construction by us. Whatever § 1981 may mean, then, it is not what it seems to say.

The panel opinion in this appeal, as well as *Jones* and subsequent Supreme Court opinions, laboriously traced and retraced the genesis of the Civil War Statutes in the 1866 Civil Rights Act[4] and the 1870 Voting Rights Act;[5] and there is scant need to do so again today. Suffice it to say that *Runyon v. McCrary*, 427 U.S. 160, 170, 96 S.Ct. 2586, 2594, 49 L.Ed.2d 415 (1976), determined that § 1981 derived in part from § 1 of the 1866 Act. The concern in *Runyon* was racial discrimination in matters of private contract, and the Court's emphasis fell naturally and properly on that source for § 1981 which treated of racial discrimination against citizens and others. Insofar as it extends protection against non-racial discrimination to aliens, however, § 1981 of necessity derives from a different source— the 1866 Act having had nothing to say on the subject of alienage.

As the Supreme Court has noted, the 1866 Civil Rights Act—which concerned it-

---

**2.** Aristotle, *Politics.*

**3.** Thus Justice Stevens has joined the Supreme Court's holding that § 1981 prohibits only intentional discrimination when used against private parties, but has opined that government violations of violations of § 1981's equal protection component do not require discriminatory intent. *See General Building Contractors Ass'n. v.*

*Pennsylvania,* 458 U.S. 375, 406, 102 S.Ct. 3141, 3158, 73 L.Ed.2d 835 (1982) (Stevens, J., concurring).

**4.** Act of April 9, 1866, ch. 31, 14 Stat. 27.

**5.** Act of May 31, 1870, ch. 114, 16 Stat. 140.

self primarily with *racial* discrimination against *citizens*—was principally motivated by a Congressional purpose to extirpate the Black Codes, Southern laws imposing a wide range of civil disabilities upon the newly-freed blacks. *General Building Contractors Ass'n. v. Pennsylvania,* 458 U.S. 375, 386, 102 S.Ct. 3141, 3147, 73 L.Ed.2d 835 (1982). Section 16 of the 1870 Voting Rights Act, by contrast, from which § 1981's protection for aliens is derived, had a different source—a legislative stream that sprang from the solicitude of its sponsor, Senator Stewart of Nevada, toward Chinese aliens subject to degrading treatment under the laws of California.[6]

Section 16 had its genesis in a resolution proposed by Senator Stewart and unanimously approved by the Senate on December 6, 1869:

> RESOLVED, That the Committee on the Judiciary be requested to inquire if any States are denying to any class of persons within their jurisdiction the equal protection of the law, in violation of treaty obligations with foreign nations and of *section one of the fourteenth amendment* to the Constitution; and if so, what legislation is necessary to enforce such treaty obligations and such amendment, and to report by bill or otherwise.

Cong. Globe, 41st Cong., 2d Sess. 3 (1869) (emphasis added).

About a month later, Senator Stewart introduced a bill, S.365, which became a foundation of the law which we construe.[7] In doing so, he described his view of the effect of S.365:

> The original civil rights bill protected all persons born in the United States in the equal protection of the laws. This bill extends it to aliens, so that all persons who are in the United States shall have equal protection of our laws. It extends the operation of the civil rights bill,

---

**6.** "Whatever one may think of the ultimate outcome of the case [*Runyon*], it is quite clear that the Court seriously misread the legislative history of § 1981. The evidence is simply indisputable, as Justice White recognized in his lengthy dissenting opinion, that § 1981 derives from § 16 of the Civil Rights Act of 1870, a statute that was not designed—at least not in any primary sense—to promote the civil rights of the nation's newly emancipated black citizens, but rather to respond to the plight of another aggrieved racial minority—the Chinese of California." McClain, *The Chinese Struggle for Civil Rights in Nineteenth Century America: The First Phase, 1850–1870,* 72 Calif.L.Rev. 529, 530 (1984).

**7.** S.365 was eventually incorporated into the 1870 Act. See remarks of Sen. Trumbell, Cong. Globe at 4307. Its language was almost identical to §§ 16, 17 and 18 of the 1870 Act:

> *Be it enacted, & c.,* That all persons within the jurisdiction of the United States, Indians not taxed excepted, shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefits of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishments, pains, penalties, taxes, licenses, and exactions of every kind, and none other, any law, statute, ordinance, regulation, or custom to the contrary not withstanding. No tax or charge shall be imposed or enforced by any State upon any person emigrating

thereto from a foreign country which is not equally imposed and enforced upon every person emigrating to such State from any other foreign country, and any law of any State in conflict with this provision is hereby declared null and void.

> *Sec. 2. And be it further enacted,* That any person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties on account of such person being an alien, or by reason of his color or race, than is prescribed for the punishment of white persons, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding $1,000 or imprisonment not exceeding one year, or both, in the discretion of the court.

> *Sec. 3. And be it further enacted,* That the act to protect all persons in the United States in their civil rights, and furnish the means of their vindication, passed April 9, 1866, is hereby reenacted, and said act, except the first and second sections thereof, is hereby referred to and made a part of this act.

Cong. Globe at 1536. There are only three material differences: the "Indian" clause in the first section was dropped; the phrase "white persons" in the second section was changed to "citizens;" and the second part of the third section was changed to make clear that the 1870 Act was to be enforced according to the enforcement provisions of the 1866 Act. (Also, "emigrating" was changed to "immigrating".)

which is well known in the Senate and to the country, to all persons within the jurisdiction of the United States. That is all there is in the bill.

Cong. Globe at 1536.

It is chiefly on the basis of part of this passage, the assertion that the bill "extends the operation" of the 1866 Act to aliens, that our panel in *Guerra*, 498 F.2d at 653, and the district court in *Espinoza v. Hillwood Square Mutual Ass'n.*, 522 F.Supp. 559 (E.D.Va.1981), which followed *Guerra*'s reasoning, concluded that § 16 was meant to forbid private alienage discrimination. This construction of his words, however, follows only on the assumption that Senator Stewart viewed the 1866 Act as reaching private discrimination—a dubious assumption indeed in view of his repeated reference to equal protection of the laws. As the passage quoted below makes perhaps too amply clear, his remarks are literally peppered with such references. Considering these and the actual words of S.365, it seems far more likely that Senator Stewart viewed the bill as directed at state action. The Revisers thought likewise in 1874, giving § 1981 its present title "Equal Rights Under the Law"; and the Supreme Court remained of that view at least as late as the *Civil Rights Cases*, 109 U.S. 3, 16, 3 S.Ct. 18, 24, 27 L.Ed. 835 (1883) and probably much longer, *see Hurd v. Hodge*, 334 U.S. 24, 31, 68 S.Ct. 847, 851, 92 L.Ed. 1187 (1948) (§ 1982 "is directed [at] governmental action" and "does not invalidate private restrictive agreements").

But to return to the legislative history of § 16, S.365 next surfaced when Senator Stewart offered a slightly modified version as part of Senator Edmund's S.810, aimed to enforce fifteenth amendment voting rights. His remarks in doing so evidence unmistakably that he, as author and original sponsor, saw the provisions as implementing the fourteenth amendment:

While [Chinese aliens] are here I say it is our duty to protect them. I have incorporated that provision [S.365] in this bill on the advice of the Judiciary Committee, to facilitate matters and so that we shall have the whole subject before us in one discussion. It is as solemn a duty as can be devolved upon this Congress to see that those people are protected, to see they have *the equal protection of the laws,* notwithstanding that they are aliens. They, or any other aliens, who may come here are entitled to that protection. If the *State* courts do not give them *the equal protection of the law,* if public sentiment is so inhumane as to rob them of their ordinary civil rights, I say I would be less than man if I did not insist, and I do here insist that that provision shall go on this bill, and that the pledge of this nation shall be redeemed, that we will protect Chinese aliens or any other aliens whom we allow to come here, and give them *a hearing in our courts; let them sue and be sued; let them be protected by all the laws and the same laws that other men are.* That is all there is in that provision.

Why is not this bill a good place in which to put that provision? Why should we not put in this bill a measure to enforce both the *fourteenth* and fifteenth amendments at once? The *fourteenth amendment* to the Constitution says that no *State* shall deny to any person *the equal protection of the laws.* Your treaty says that they shall have *the equal protection of the laws.* Justice and humanity and common decency require it. I hope that provision will not be left off this bill, for there is no time to take it up as a separate measure, discuss it, and pass it at this session.

Cong. Globe at 3658 (emphasis added). What more could he have said?

The Senate passed H.R.1293 (including the provisions of S.365) the following day. Cong. Globe at 3690.[8] The rest of the

---

8. H.R.1293 was passed by a vote of 43–8 under the title "A bill to Enforce the Right of Citizens of the United States to Vote in the Several States of this Union." Senator Stewart moved to amend the title.

Mr. STEWART. Add there the words "and for other purposes."

Mr. SUMMER. Why do you want to have "other purposes" in?

legislative history of § 16 in both the House and the Senate[9] is completely consistent with the soliloquy of its author and original sponsor Senator Stewart. *See* generally *McCrary,* 427 U.S. at 195–205, 96 S.Ct. at 2606–2611 (White, J., dissenting) (reviewing the history of § 16 of the 1870 Act as part of his unsuccessful argument that § 1981 was derived entirely from the 1870 Act). Whatever the intentions behind the 1866 Act, it seems clear that the 1870 Act was passed as a statutory implementation of the fourteenth amendment, and that the Congressional intent as to it was to curtail *state* action discriminating unfairly against aliens.

Thus the legislative history: To us it appears to indicate with great clarity that Congress's intent in passing § 16 was, in Senator Sherman's trenchant formulation, to "... protect the Chinese against the local laws of California...."[10] Section 16 was never reenacted by the Congress, as was the 1866 Act as § 18 of the 1870 Voting Rights Act; and there is no further intent for us to seek than that with which it was originally passed.[11] In Senator Stewart's recurring phrase, "That is all there is in the bill."

> Mr. STEWART. Here is a provision to enforce the fourteenth amendment. Strike out all after "Union" and insert "and for other purposes."
> Mr. SUMMER. That is the whole case.
> Mr. STEWART. No; the fourteenth amendment, to prevent improper holding of office, and then the civil rights bill have been put on. The motion passed and the title was amended. Cong. Globe at 3690.

**9.** There was sharp debate over the voting rights bill leading to the 1870 Act, but little mention of the section that became § 16 and eventually § 1981. In one of those few passages, Senator Sherman ruminated about S.810 and S.365:

> These bills seem to have the sanction of the Judiciary Committee. Probably after examination I might approve them; but they are certainly adding an independent subject, making it necessary to change the title of this bill, to change the scope of it, to enlarge greatly the purpose for which the House bill [H.R. 1293] was passed, because *these provide for enforcing the fourteenth amendment* as well as the fifteenth, and provide also for dragging into the controversy the Chinese question and questions of that kind. I am not sure but that after discussion I would agree with the Com-

*Later Developments*

Matters did not rest there, however. As we note above, in 1968 the Supreme Court entered upon a series of landmark decisions that called the Nineteenth Century Civil Rights Statutes back into service. The first of these, *Jones v. Alfred Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189, declared that § 1982—a companion to § 1981 governing rights in property—forbade *private racial* discrimination. Justice Harlan, joined by Justice White, dissented, characterizing the opinion as "most ill-considered and ill-advised" and raising against it the arguments rehearsed again by our panel at 808 F.2d, at 1092–1097. These need not be repeated here. Suffice it to say that, although they did not carry the day, by the time the Court next spoke in the general area they had apparently persuaded at least four members of it that *Jones* was wrongly decided.

For eight years after *Jones* came *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), in which the Court transposed the § 1982 reasoning of *Jones* onto § 1981, holding that racial discrimination in matters of private contracts

> mittee on the Judiciary, that we must *protect the Chinese against the local laws of California;* but it seems to me we ought to do it with our eyes open, and understand what we are doing.
> Cong. Globe at 3570 (emphasis added).

**10.** See note 9 above.

**11.** That of the Revisers who incorporated § 16 into the redacted § 1981 was not a legislative one, and they of course lacked power to legislate. Rather, they were appointed pursuant to the Act of June 27, 1866, ch. 140, 14 Stat. 74, reenacted by Act of May 4, 1870, ch. 72, 16 Stat. 96, "to revise, simplify, arrange, and consolidate all statutes of the United States...." § 1, 14 Stat. at 74. Congress commanded them to "bring together all statutes and parts of statutes which, from similarity of subject, ought to be brought together, omitting redundant or obsolete enactments, and making such alterations as may be necessary to reconcile the contradictions, supply the omissions, and amend the imperfections of the original text...." § 2, 14 Stat. at 75.

The Revisers' powers were thus housekeeping, not legislative, ones; and the intent with which they acted does not signify.

generally was forbidden by it. By now, serious misgivings about this course of reasoning had begun to trouble some members of the Court. Justice White, joined by (then) Justice Rehnquist, filed an eloquent dissent which built upon that of Justice Harlan in *Jones.* Justice Powell, conceding that he was almost persuaded by Justice White's reasoning, declined to join his dissent because he felt obliged to adhere to *Jones* and other recent decisions of the Court which he had joined; and Justice Stevens, declaring a firm "...conviction that *Jones* was wrongly decided" and "would have amazed the legislators who voted for" the Civil Rights Act of 1866, nevertheless adhered to it as "an important part of the fabric of our law." 427 U.S., at 189, 190, 96 S.Ct. at 2604.

But none of these opinions decides the question in today's case: whether these venerable enactments extend to forbidding citizens of the United States to draw *private* distinctions between other citizens and aliens on grounds, not of race, but of *nationality* [12]. For us, of course, there is no question whether to adhere or not to *Jones* and *McCrary;* they are part of our marching orders, mandates which we can either obey or seek other work. But that is not the issue. The issue is whether, because the Supreme Court reasoned in a particular manner on one subject, we are obliged to extend that reasoning, when it seems to us—and not to us only—severely flawed, to a new series of situations to which the Court has not yet spoken.

The dissent cuffs the issue away in a few paragraphs simply reiterating the extension in *Guerra*—without stated reasoning or explanation—of *Jones*'s faulty analysis from *racial* discrimination to private distinctions based on nationality. We think a decision which mandates, among other things, that a Libyan or Iranian citizen cannot legally be denied employment as a designer of coding equipment with a defense contractor on the grounds of divided loyalty merits a brief explanation of why it is thought to be required by statute. Convinced that a proper subordination does not require such a course of action and that good conscience argues against it, we decline to embark upon it.

### Analysis

For the reasons expressed by Justice White in his *McCrary* dissent, and echoed by most observers who take the view that words have an ascertainable meaning, it seems to us beyond serious dispute that the reasoning of *Jones* and *McCrary* cannot stand of its own force. The Supreme Court's last expressions on the subject of whether § 1981 was intended to reach *private, racial* discrimination are to be found in *McCrary,* however; and these reflect the considered judgment of the Court as then constituted that, right or wrong, the issue has been decided and laid to rest. This is the voice of authority, and there—for our Court—the matter ends: it reaches such discrimination. Neither reason nor authority, however, constrains us to rule that it forbids the drawing of private distinctions between persons based on *citizenship.* [13]

Certainly reason does not; by the time of Justice Powell's resignation, a majority of the sitting Justices who had expressed official views on the point had concluded that *Jones* was wrongly decided. If it was, there is no occasion to extend its flawed reasoning to a new subject. Clearly authority does not require us do so, as the Court has not spoken to the issue and has hinted, at least, that it regards it as an open one.[14] It cannot be denied, however,

---

**12.** The dissent confidently asserts that "[a]s early as *Takahashi* ... the protection of [§ 1981 had] been held to extend to aliens," citing to *Graham v. Richardson* as well. Dis. Op., *infra* p. 1354. Both *Graham* and *Takahashi,* however—the only Supreme Court § 1981 alien cases cited by the dissent—plainly rest on a state-action/ Fourteenth Amendment analysis; and no Supreme Court case has yet held what the dissent would hold today.

**13.** That the Fourteenth Amendment forbids public ones in most instances is settled. *Bernal v. Fainter,* 467 U.S. 216, 104 S.Ct. 2312, 81 L.Ed.2d 175 (1984).

**14.** *Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 96 n. 9, 94 S.Ct. 334, 340 n. 9, 38 L.Ed.2d 287 (1973).

that construing the same language to mean one thing as applied to one subset of "persons"—blacks—and another as applied to a different one—foreign nationals—is awkward and undesirable. Indeed, it was on that basis that Justice White, assuming that the answer to the issue before us could only be as we decide it today, argued against the *McCrary* result:

> [A]s noted above, § 1977 [present § 1981] of the Revised Statutes was passed by Congress with the Revisers' unambiguous note before it that the section derived solely from the Fourteenth Amendment statute, accompanied by the confirmatory sidenote "equal rights under the law." Second and more importantly, the majority's argument is logically impossible, because it has the effect of construing the language *"the same rights to make ... contracts ... as is enjoyed by white citizens,"* contained in § 1977 of the Revised Statutes, to mean one thing with respect to one class of "persons" and another thing with respect to another class of "persons." If § 1981 is held to be a reenactment of the Thirteenth Amendment statute aimed at private discrimination against "citizens" and the Fourteenth Amendment statute aimed at state-law-created legal disabilities for "all persons," including aliens, then one class of "persons"—Negro citizens—would, under the majority's theory, have a right not to be discriminated against by private individuals and another class—aliens—would be given by the same language no such right. *The statute draws no such distinction among classes of persons. It logically must be construed either to give "all persons" a right not to be discriminated against by private parties in the making of contracts or to give no persons such a right. Aliens clearly never had such a right under the Fourteenth Amendment statute (or any other statute); § 1977 is concededly derived solely from the Fourteenth Amendment statute so far as coverage of aliens is concerned; and there is absolutely no indication that aliens' rights were expanded by the reenactment of the Four-teenth Amendment statute in § 1977 of the Revised Statutes of 1874. Accordingly, the statute gives no class of persons the right not to be discriminated against by private parties in the making of contracts.*

427 U.S., at 205–6, 96 S.Ct. at 2611 (first emphasis in original; second emphasis added).

In the teeth of his argument, however, the Court did as it did; and in at least one later instance it has construed identical language to mean one thing as to one group, another as to a different one. *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978) ("prevailing party" in Civil Rights Attorneys' Fee Statute means one thing as to party plaintiff, another as to party defendant). In today's case, given the fact that § 1981 is a redactor's amalgam of two different enactments, each aimed at a different group, the objection, while troubling, carries less force than it would in such a case as *Christiansburg*, where a single enactment was differentially construed in respect of persons so as to favor plaintiffs over defendants.

Thus it appears that in today's case nothing in Supreme Court precedent forbids us to accord the words of § 1981—as they apply to aliens—their natural meaning. Relieved of the *Jones* and *McCrary* gloss, applied by the Court to the subset of *race*-based distinctions, it is patent that these words circumscribe state action only. And, in addition to their obvious intent, various circumstances and developments since their resurrection as to race in *Jones* reinforce this conclusion. Many of these are peripheral and circumstantial, but added together they have weight.

One of these is the very innocence displayed by several well-informed observers present on the factual scene of any suspicion that § 1981 might have been intended to control citizens in their private dealings with non-citizens. That it was not so intended, Justice White, in his dissent partially quoted above, thought so obvious that he founded an argument upon it, one that § 1981 could not be held to cover private

racial discrimination because to hold that it did would logically compel a parallel and unthinkable holding that it covered alienage. And a few years before, in *Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973), § 1981 was not even advanced by counsel as an alternate ground in that lawsuit's attempt to equate alienage with "national origin" discrimination for Title VII purposes.

As for Congress's view of the matter, it can scarcely be an oversight that, although it included the categories of "race, color, religion, sex [and] national origin" in the general Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* that of *citizenship* is nowhere to be found; and the Supreme Court has expressly held that the term "national origin" as there employed does not embrace it. *Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973).

Instead, when Congress determined that because of its Immigration Reform and Control Act of 1986 there was reason to fear serious and widespread discrimination in employment on the basis of alienage, it enacted § 274B(a)(1) of that Act (8 U.S.C. § 1324B) to prevent this:

> It is an unfair immigration-related employment practice for a person or other entity to discriminate against any individual (other than an unauthorized alien) with respect to the hiring, or recruitment, or referral for a fee ... the discharging of ... [an] individual ...
>
> > (A) because of such individual's national origin, or
> >
> > (B) in the case of a citizen or intending citizen ... because of such individual's citizenship status.

These actions are hardly those of a legislator which was of the view that alienage is a category appropriately yoked to race in anti-discrimination legislation,[15] or that § 1981 already prohibited private employment discrimination on alienage grounds to the same rigorous and stringent degree as *McCrary* declares that it forbids such racial discrimination. Had such a law, with such prohibitions, been already in place, there would have been no occasion for the heroic exertions that must have been called for to pass such a provision as § 1324B. And, on the other hand, if § 1981 has been correctly interpreted by *Guerra* to protect all aliens, legal and *illegal,* from employment discrimination, then it necessarily follows that the 1986 Immigration Act either "repeals" § 1981 to the extent that it has been read to protect *illegal* aliens from employment discrimination or remits illegals to whatever their § 1981 remedies may be, while denying them any under the 1986 Act. Neither result seems one that Congress likely intended.

### Conclusion

However laudable its cause and purpose, the reasoning which led the Supreme Court to construe § 1981 as reaching private racial discrimination has now been called in serious question by three present members of the Court itself, as well as by the late Justice Harlan and by retired Justice Powell. In these circumstances, it would be inappropriate for us to extend that reasoning across the board to forbid all private alienage distinctions, especially when the language of the statute is to the contrary, when the original enactment from which it was drawn even more clearly was limited to public alienage discrimination alone, and

---

**15.** Indeed, the Supreme Court has recognized a "political function" exception to the strict scrutiny ordinarily accorded laws discriminating on the basis of alienage, one that permits the exclusion of such persons on a rational basis test from "positions intimately related to the process of democratic self-government," such as members of police forces, public school teachers, probation officers, and the like. *Bernal v. Fainter,* 467 U.S. 216, 104 S.Ct. 2312, 81 L.Ed.2d 175 (1984); *Cabell v. Chavez-Salido,* 454 U.S. 432, 102 S.Ct. 735, 70 L.Ed.2d 677 (1982); *Ambach v. Norwick,* 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979); *Foley v. Connelie,* 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978). That such an exception on racial grounds would be unthinkable reinforces our conclusion that treating racial and alienage distinctions as governed by the same rules was never intended. Despite his obvious over-qualification for the position, for example, one may well stick at an interpretation of § 1981 which forbids Boeing Aircraft to refuse employment as its Director of Research and Development to General Secretary Gorbachev because he is a Soviet citizen.

when reasonable inferences from later Congressional enactments indicate a contrary intent.

Racial and citizenship distinctions are things of a different kind. The former is, for the individual, immutable; the latter is not. The former our polity and increasingly our society as well are resolved, and rightly resolved, to have done with, root and branch, as representing an evil, always and everywhere. The latter is not so readily and roundly condemned: when all is said and done, patriotism remains a civic virtue; and one whose allegiance is bound to another nation may not be suited for certain callings in ours, as the Supreme Court itself has recognized.[16] And while the alien guest is not without his own special claims upon us, arising from our moral tradition,[17] they are of a different quality from those grounded in our common humanity. For these reasons, we conclude that *Guerra* was wrongly decided and that its extension of the faulty *Jones* analysis, by simple fiat and without supporting reasoning, from race to nationality was improper. We overrule it.

Except as modified by the panel opinion and by this opinion, we AFFIRM the judgment of the district court and REMAND the cause for further proceedings.

PATRICK E. HIGGINBOTHAM, Circuit Judge, specially concurring:

I add this explanation of my resolution of what for me is the most difficult issue in this case—whether we are being faithful to our obligation as an inferior court to obey decisions of the United States Supreme Court.

Obedience by inferior courts to the command of the Supreme Court is essential to the administration of our complex court structure. For the Supreme Court to fulfill its unique role set by Article III, the federal system simultaneously must encourage candid expression by inferior courts while demanding acceptance of the Supreme

Court's role as the final arbiter. This inherent tension now is increased because the Supreme Court's annual capacity for written opinions is approximately 150, an apparent constant, while inferior courts are producing a rapidly increasing number of decisions. This reality reinforces the traditional values of stare decisis. As an inferior court we must not allow our version of a "correct" result to deceive us into semantic games of reformulation and hair splitting in order to escape the force of a fairly resolved issue.

The notion that as an inferior court we are free to strip content from principle by confining the Supreme Court's holding to the precise facts before it is a heady assertion indeed; that notion ignores our role. Our duty to the Supreme Court precedent is broader than our duty to abide our own precedent and that of courts on our level. When the duty of obedience flows horizontally and not vertically, a later court may appropriately after due regard for our necessary dependence upon panel harmony in a multi-panel court and to the values of stare decisis such as predictability and settlement of expectation, confine the first case to its facts by concluding, in the words of Karl N. Llewellyn, that: "This rule holds only to redheaded Walpoles in pale magenta Buick cars." Our duty is different when the reach of precedent is vertical.

We are about words and ideas, not mechanics, and defining the margin of our duty is a slippery undertaking. That Justices Harlan and White detailed the statutory interpretation that we repeat today is not enough. It is true that at least five members of the court (before Justice Powell's retirement) have been persuaded that the earlier readings of history were wrong, but at least two of the five Justices would adhere to the holdings of *Jones* and *Runyon*, though they rested on a view of history the Justices no longer credit. Accepting these holdings our result admittedly is awkward. While it is awkward to conclude that identical statutory language reaches

---

**16.** See note 14 above.

**17.** *E.g.,* "When an alien settles with you in your land, you shall not oppress him. He shall be treated as a native born among you, and you shall love him as a man like yourself, ..." 19 Leviticus 33 (New English Bible).

private discrimination on the basis of race but not alienage, the awkwardness is not conclusive. Justice Stevens has pointed out, the awkwardness arises because "[t]he Court has broadened the coverage of § 1981 far beyond the scope actually intended by its authors."

The difficulty of two meanings in identical language is also mitigated by the circumstance that the Court, although abiding the holdings of *Jones* and *Runyon*, has been willing to make § 1981 fit with principles of the fourteenth amendment, even where § 1981's text might indicate otherwise. The Court did so in *General Building Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982), holding that § 1981 prohibits only wilful racial discrimination. Justice Stevens explained that because in his reading the 39th Congress never intended for § 1981 to reach employment discrimination, the legislative history was an improbable source for answering the question of whether the statute should be read to forbid only intentional conduct. Because the statute itself did not require proof of intent "a logician would be comfortable in concluding that no such proof should ever be required." *Id.* 458 U.S. at 406, 102 S.Ct. at 3158.

Justice Stevens then concluded:
Nevertheless, since that requirement tends to define the entire coverage of § 1981 in a way that better reflects the basic intent of Congress than would a contrary holding, I concur in the conclusion [that intent must be shown] ... insofar as it relates to the statutory protection of equal opportunity but, perhaps illogically, would reach a different conclusion in a case challenging a denial of a citizen's civil rights.

*Id.* at 406, 102 S.Ct. at 3158.

This suggests that the Court could accommodate *Jones* and *Runyon* with the conclusion that § 1981, in parallel with the thirteenth and fourteenth amendments, reaches private racial discrimination but requires state action for discrimination against aliens, in spite of the absence of supporting statutory language and the

seeming incongruity that results. The vertical command of precedent in *Jones* and *Runyon*, then, although not completely clear, is not much more than the *ratio decidendi:* § 1981 reaches private racial discrimination. In these unique circumstances where the Justices themselves have peeled cases to their holdings, we are justified in declining an extension that in other circumstances we might properly be duty bound to make.

The matter is further complicated because we are asked to interpret a congressional enactment. Courts must be particularly circumspect in reconsidering decisions interpreting statutes. Just as a working federal judiciary demands vertical adherence to precedent, there is a point at which the orderly accommodation of law-making and law-interpreting demands that we resist reconsideration because Congress may well have acquiesced in prior statutory interpretations. Yet I see little reason to believe that Congress has assumed the *extension* of § 1981 that we today reject, especially given that, as Judge Gee notes, Congress has acted in a way inconsistent with the view that private discrimination against aliens is prohibited. Congress, however, has not signaled its disagreement with the Court's construction of § 1981 reach of private *racial* discrimination. *See Runyon v. McCrary*, 427 U.S. 160, 174 n. 11, 96 S.Ct. 2586, 2596 n. 11, 49 L.Ed.2d 415 (1976).

As made plain by this separate writing, I find the issue of precedent to be difficult, and it is only after pause that I have found the side of the line on which this case falls. While this is a close case, this is not a seldom encountered task. Only recently we confronted a similar problem in dealing with border searches. There, Judge Reavley, Judge Garwood and I concluded that *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975), could not be given the restrictive reading that others would give it and we followed its command. *See United States v. Jackson*, 825 F.2d 853, 873, 874 (5th Cir.1987). Persuaded that today we are adhering to a principled line, I agree that having ex-

plained our position we ought to stand in place pending further direction from our superiors.

REAVLEY, Circuit Judge, with whom POLITZ, RANDALL, JOHNSON, JERRE S. WILLIAMS, and W. EUGENE DAVIS, Circuit Judges, join, dissenting:

The majority today overrules *Guerra v. Manchester Terminal Corp.*, 498 F.2d 641 (5th Cir.1974), and holds that 42 U.S.C. § 1981 does not reach private discrimination based on alienage. I respectfully insist that this holding is foreclosed to us by the decisions of the Supreme Court.

As early as *Takahashi v. Fish and Game Commission*, 334 U.S. 410, 419, 68 S.Ct. 1138, 1142–43, 92 L.Ed. 1478 (1948), the Court, after quoting the predecessor of section 1981, stated: "[t]he protection of this section has been held to extend to aliens as well as to citizens." The Court reiterated its commitment to this principle in *Graham v. Richardson*, 403 U.S. 365, 377, 91 S.Ct. 1848, 1855, 29 L.Ed.2d 534 (1971). In *Runyon v. McCrary*, 427 U.S. 160, 168, 96 S.Ct. 2586, 2593, 49 L.Ed.2d 415 (1976), the Court stated: "[i]t is now well established that ... 42 U.S.C. § 1981 prohibits racial discrimination in the making and enforcement of private contracts." Thus, under *Takahashi*, section 1981 bans discrimination based on alienage, and, under *Runyon*, it bans discrimination in the making and enforcement of private contracts. From these two premises the holding of *Guerra* necessarily follows: section 1981 forbids private discrimination based on alienage. By what lights can we construe this statute giving "full and equal benefits of all laws" to benefit unequally the persons it protects?

The root and trunk of the majority's holding is the conviction that the legislative history of section 1981 as outlined by the Court in *Runyon* is erroneous. The author of a law review article is quoted in footnote 6 to say that the Court has misread the legislative history of the statute. Then we are told that the Supreme Court's reasoning is "severely flawed." Suffice it to say that while authors of law review articles

enjoy the luxury of finding Supreme Court reasoning "severely flawed," the Fifth Circuit Court of Appeals is not at liberty to decide a case on this ground. Incidentally, this court has followed the dictate of that "flawed" reasoning for a long time. Our leading case in this area is *Sanders v. Dobbs Houses, Inc.*, 431 F.2d 1097 (5th Cir.1970). As we said in *Guerra*, "[w]e held in *Sanders* ... that § 1981 extends to private discrimination in employment, and we have reaffirmed Judge Clark's cogent *Sanders* opinion many times since." 498 F.2d at 654 (citations omitted).

With due respect for Aristotle's injunction which constricts the majority, I take the law from the Supreme Court. But perhaps we should recall that Aristotle also said: "by nature some are free, others slaves," *Politics* 1254b32, and "the best state will not make the mechanic a citizen." *Politics* 1277b33. Personally, I prefer the familiar maxim that "all men are created equal." It seems likely that the latter sentiment, rather than the Aristotlean one, imbued the intent of Congress when section 1981 was enacted.