**Vincent P. DUANE, Plaintiff–Appellee,**

v.

**GEICO; Geico General Insurance Company, Defendants– Appellants.**

**American Civil Liberties Union; Mexican– American Legal Defense and Education Fund; Public Citizen, Amici Curiae.**

No. 92–1616.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 27, 1992.

Decided Oct. 12, 1994.

**ARGUED:** Thomas J.S. Waxter, Jr., Semmes, Bowen & Semmes, Baltimore, MD, Harley Thomas Howell, Howell, Gately, Whitney & Carter, Towson, MD, for appellants. Jerome Vincent Bolkcom, Washington, DC, for appellee. **ON BRIEF:** J. Douglass Ruff, Washington, DC, for appellants. Vincent P. Duane, Washington, DC, for appellee. Lucas Guttentag, American Civ. Liberties Union Foundation Immigrants' Right Project, New York City; David C. Vladeck, Cornish F. Hitchcock, Public Citizen, Washington, DC; H. Jefferson Powell, Duke Law School, Durham, NC; Eileen B. Hershenov, Rebecca W. French, Charles L. Kerr, Morrison & Foerster, New York City; Kevin Baker, Valerie Small Navarro, Mexican American Legal Defense and Educational Fund, Los Angeles, CA, for amici curiae.

Before ERVIN, Chief Judge, and · RUSSELL and WILKINS, Circuit Judges.

Affirmed by published opinion. Judge DONALD RUSSELL wrote the opinion, in which Chief Judge ERVIN and Judge WILKINS joined.

## OPINION

DONALD RUSSELL, Circuit Judge:

Defendant Government Employees Insurance Company (GEICO) appeals the district court's denial of its motion to dismiss plaintiff Vincent Duane's discrimination claim under 42 U.S.C. § 1981, 784 F.Supp. 1209. We find no error in the district court's denial and affirm.

### I

Vincent Duane is a lawfully admitted, permanent resident alien of the United States and a citizen of Australia. On June 3, 1991, Duane contacted GEICO about obtaining insurance for his newly purchased home. In response to a question from the GEICO sales agent, Duane disclosed his citizenship status. The sales agent informed Duane that GEICO would not write homeowner's insurance for him because he was not a United States citizen. Duane then spoke with one of GEICO's supervisory personnel, who confirmed that GEICO had a policy of refusing to enter into contracts for homeowner's insurance with persons who were not United States citizens.

Duane filed this action against GEICO in the District of Maryland in September, 1991, claiming that GEICO's action in denying him insurance because he was not a United States citizen violated section 1981. GEICO moved to dismiss on the ground, among others, that Duane failed to state a claim upon which relief could be granted because section 1981 did not prohibit private alienage discrimination. The district court denied GEICO's motion, finding that section 1981 did prohibit private alienage discrimination, but certified its order for immediate appeal under 28 U.S.C. § 1292(b).

### II

■ Section 1981 was amended in November, 1991, by section 101 of the 1991 Civil Rights Act, Pub.L. No. 102–166, § 101, 105

Stat. 1071 (1991).[1] We must first address whether section 101 should be applied here, where GEICO's conduct occurred prior to November, 1991. The Supreme Court recently addressed in *Rivers v. Roadway Express, Inc.,* —— U.S. ——, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994), whether section 101 of the 1991 Civil Rights Act "applies to a case that arose before it was enacted," *id.* at ——, 114 S.Ct. at 1513, and held that "§ 101 does not apply to preenactment conduct," *id.* at —— —— ——, 114 S.Ct. at 1519–20. We therefore conclude that section 101 cannot apply here; accordingly, we will examine section 1981 prior to its amendment by section 101.[2]

### III

■ We turn to the crux of this case: whether section 1981, prior to its amendment by the 1991 Civil Rights Act, prohibited GEICO's discrimination against Duane.

Section 1981 has its origins in the Civil Rights Act of 1866 (the 1866 Act) and the Voting Rights Act of 1870 (the 1870 Act). *Runyon v. McCrary,* 427 U.S. 160, 168–70 n. 8, 96 S.Ct. 2586, 2593–94 n. 8, 49 L.Ed.2d 415 (1976). Section 1 of the 1866 Act stated in relevant part:

That ... citizens of the United States ... of every race and color ... shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and

proceedings for the security of persons and property, as is enjoyed by white citizens. . . .

Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27 (1866).

Section 18 of the 1870 Act reenacted the 1866 Act. Voting Rights Act of 1870, ch. 114, § 18, 16 Stat. 140 (1870). Section 16 of the 1870 Act expanded many of section 1's discrimination protections to non-citizens by adding the following:

That all persons within the jurisdiction of the United States shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens. . . .

Voting Rights Act of 1870, ch. 114, § 16, 16 Stat. 140 (1870). *See General Bldg. Contractors Ass'n, Inc. v. Pennsylvania,* 458 U.S. 375, 385–86, 102 S.Ct. 3141, 3147, 73 L.Ed.2d 835 (1982).

In 1874, section 1 of the 1866 Act and section 16 of the 1870 Act were codified without substantive change. *McCrary,* 427 U.S. at 168–70 n. 8, 96 S.Ct. at 2593–94 n. 8. A portion of section 1 of the 1866 Act, that which gave all citizens the same rights to make and enforce contracts, to sue, be parties, and give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, as is enjoyed by white citizens, was combined with

1. Section 1981 stated prior to the amendment:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981. Section 101 amended section 1981 by redesignating section 1981's existing text as subsection (a), and adding:

(b) For the purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all

benefits, privileges, terms, and conditions of the contractual relationship.

(c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

Pub.L. No. 102–166, § 101, 105 Stat. 1071 (1991).

2. Duane contends that *Rivers* held only that section 101(b), not section 101 in its entirety, does not apply retroactively. This contention ignores the plain language of *Rivers:* the Court stated throughout its opinion that it was addressing whether *section 101* applied retroactively. *See, e.g., Rivers,* —— U.S. at ——, 114 S.Ct. at 1513 ("We granted certiorari to decide whether § 101 applies to a case that arose before it was enacted. We hold that it does not.").

all of section 16 of the 1870 Act, which provided these same rights to all persons within the jurisdiction of the United States, to form what is now 42 U.S.C. § 1981. *Id.* Section 1981, prior to its amendment by section 101 of the 1991 Civil Rights Act, thus provided in relevant part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens....

42 U.S.C. § 1981.

The remainder of section 1 of the 1866 Act, which granted all citizens the same rights to inherit, purchase, lease, sell, hold, and convey real and personal property, as is enjoyed by white citizens, was codified to create what is now 42 U.S.C. § 1982. *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 422 & n. 28, 88 S.Ct. 2186, 2194 & n. 28, 20 L.Ed.2d 1189 (1968). Section 1982 states:

> All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

42 U.S.C. § 1982.

The Supreme Court in *Jones* addressed whether section 1982 prohibited private discrimination against a black citizen in the sale of real property. The Court held that "§ 1982 bars *all* racial discrimination, private as well as public, in the sale or rental of property." *Jones,* 392 U.S. at 413, 88 S.Ct. at 2189 (emphasis in original). Section 1982, the Court noted, had its origins in section 1 of the 1866 Act, *id.* at 422, 88 S.Ct. at 2194, and section 1 "guaranteed all citizens the same right ... to inherit, purchase, lease, sell, hold, and convey real and personal property ... as is enjoyed by white citizens," *id.* at 423, 88 S.Ct. at 2194 (quotation omitted). The Court then reasoned:

> To the Congress that passed the Civil Rights Act of 1866, it was clear that the right to do these things might be infringed not only by State or local law but also by custom ... or prejudice. Thus, when Con-

gress provided in § 1 of the Civil Rights Act that the right to purchase and lease property was to be enjoyed equally throughout the United States by Negro and white citizens, it plainly meant to secure that right against interference from any source whatever, whether governmental or private.

*Id.* at 423–24, 88 S.Ct. at 2194–95 (quotations omitted).

Moreover, the Court continued, if section 1 did not apply to private discrimination, "much of § 2 [of the 1866 Act] would have made no sense at all." *Id.* at 424, 88 S.Ct. at 2195. The Court explained:

> [Section 2], which provided fines and prison terms for certain individuals who deprived others of rights "secured or protected" by § 1, was carefully drafted to exempt private violations of § 1 from the criminal sanctions it imposed. There would, of course, have been no private violations to exempt if the only "right" granted by § 1 had been a right to be free of discrimination by public officials.

*Id.* at 424–26, 88 S.Ct. at 2195–96. "Hence," the Court concluded, "the structure of the 1866 Act, as well as its language, points to the conclusion urged by [petitioners]—that § 1 was meant to prohibit *all* racially motivated deprivations of the rights enumerated in the statute...." *Id.* at 426, 88 S.Ct. at 2196 (emphasis in original).

Eight years later, the Court in *McCrary* addressed the related question of whether section 1981 prohibited private discrimination against black citizens in the making of contracts. The Court found that section 1981 did apply to such private discrimination. *McCrary,* 427 U.S. at 170–71, 96 S.Ct. at 2594–95. It stated: "In *Jones* the Court held that the portion of § 1 of the Civil Rights Act of 1866 presently codified as 42 U.S.C. § 1982 prohibits private racial discrimination in the sale or rental of real or personal property." *Id.* at 170, 96 S.Ct. at 2594. The holding in *Jones,* the Court reasoned, "necessarily implied that the portion of § 1 of the 1866 Act presently codified as 42 U.S.C. § 1981 likewise reaches purely pri-

vate acts of discrimination." *Id.* The Court explained:

> The statutory holding in *Jones* was that the "[1866] Act was designed to do just what its terms suggest: to prohibit all racial discrimination, whether or not under color of law, with respect to the rights enumerated therein ..." 392 U.S., at 436, [88 S.Ct., at 2201]. One of the "rights enumerated" in § 1 is "the same right ... to make and enforce contracts ... as is enjoyed by white citizens...." 14 Stat. 27.

*Id.* As a result, the Court concluded:

> Just as in *Jones* a Negro's § 1 right to purchase property on equal terms with whites was violated when a private person refused to sell to [him] solely because he was a Negro, so also a Negro's § 1 right to "make and enforce contracts" is violated if a private offeror refuses to extend to [him], solely because he is a Negro, the same opportunity to enter into contracts as he extends to white offerees.

*Id.* 427 U.S. at 170–71, 96 S.Ct. at 2594. *See also Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975) (holding, with little discussion, that section 1981 applies to private racial discrimination); *Tillman v. Wheaton-Haven Recreation Ass'n,* 410 U.S. 431, 439–40, 93 S.Ct. 1090, 1094–95, 35 L.Ed.2d 403 (1973) (same).

The Court recently reaffirmed *McCrary* and, because *McCrary* was based on *Jones, Jones* as well, in *Patterson v. McLean Credit Union,* 491 U.S. 164, 172, 109 S.Ct. 2363, 2370, 105 L.Ed.2d 132 (1989). There the Court concluded that "*McCrary* should not be overruled" and "reaffirm[ed] that § 1981 prohibits racial discrimination in the making and enforcement of private contracts." *Id.*

With this background of the history and case law surrounding section 1981, we can address the issue before us, whether section 1981, prior to its 1991 amendment, prohibited GEICO's discrimination against Duane. The Supreme Court has established that section 1981 prohibits at least public discrimination against aliens, *see Graham v. Richardson,* 403 U.S. 365, 377, 91 S.Ct. 1848, 1854–55, 29 L.Ed.2d 534 (1971); *Takahashi v. Fish & Game Comm'n,* 334 U.S. 410, 419, 68 S.Ct. 1138, 1142, 92 L.Ed. 1478 (1948); GEICO contends that section 1981 did not prohibit its discrimination against Duane because section 1981 does not prohibit *private* discrimination against aliens.

Consistent with the Supreme Court's analysis of the scope of section 1981's prohibitions against discrimination, *see McCrary,* 427 U.S. at 168–71, 96 S.Ct. at 2593–95, we address the question of whether section 1981 prohibits private discrimination against aliens by examining the origin of section 1981's prohibition of discrimination against aliens. This prohibition originated in section 16 of the 1870 Act, which was discussed above. Accordingly, we must consider whether section 16 of the 1870 Act barred private discrimination against aliens.

We find that *Jones* and *McCrary* mandate the conclusion that section 16 of the 1870 Act did bar private discrimination against aliens. The Court in these decisions held that section 1 of the 1866 Act prohibited private discrimination against citizens in their exercise of the rights enumerated in section 1, *McCrary,* 427 U.S. at 170–71, 96 S.Ct. at 2594–95; *Jones,* 392 U.S. at 426, 88 S.Ct. at 2196, because the language of section 1 as well as the structure of the 1866 Act indicated that Congress "plainly meant," *id.* at 423–24, 88 S.Ct. at 2195, to prohibit private discrimination, *id.* at 426, 88 S.Ct. at 2196. We determine that *Jones* and *McCrary* require us to find that section 16 of the 1870 Act reached private discrimination because the language of section 16 and structure of the 1870 Act are nearly identical to the language of section 1 of the 1866 Act and the structure of the 1866 Act.

With respect to the similarity in language between section 16 of the 1870 Act and section 1 of the 1866 Act, section 1 stated in relevant part:

> That ... citizens of the United States ... of every race and color ... shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property,

and to full and equal benefit of all laws and proceedings for the security of persons and property, as is enjoyed by white citizens....

Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27 (1866). Section 16 of the 1870 Act stated in relevant part:

That all persons within the jurisdiction of the United States shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens....

Voting Rights Act of 1870, ch. 114, § 18, 16 Stat. 140 (1870). The similarity in language is evident from the face of the two provisions; moreover, the Supreme Court has even observed that section 16 of the 1870 Act was "patterned after" section 1 of the 1866 Act. *Hurd v. Hodge,* 334 U.S. 24, 31 n. 7, 68 S.Ct. 847, 851 n. 7, 92 L.Ed. 1187 (1948). The Supreme Court's determination in *Jones* that the language of section 1 of the 1866 Act prohibited private discrimination against "citizens" in their exercise of the rights enumerated in section 1, therefore, virtually compels the conclusion that section 16 of the 1870 Act prohibited private discrimination against "all persons within the jurisdiction of the United States," including aliens, in their exercise of the rights enumerated in section 16.

The similarity between the structure of the 1870 Act and that of the 1866 Act is even more striking. The Supreme Court found that the structure of the 1866 Act indicated that section 1 of that act prohibited private discrimination because if it did not, "much of § 2 [of the 1866 Act] would have made no sense at all." *Id.* 392 U.S. at 424, 88 S.Ct. at 2195. Section 2 provided in relevant part:

That any person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act ... shall be deemed guilty of a misdemeanor....

Civil Rights Act of 1866, ch. 31, § 2, 14 Stat. 27 (1866). Section 2, by its terms, applied only to those who violated section 1 while acting "under color of any law, statute, ordinance, regulation, or custom" and, therefore, "exempt[ed] private violations of § 1 from the criminal sanctions it imposed." *Jones,* 392 U.S. at 424–25, 88 S.Ct. at 2195. Section 1 must have applied to private discrimination, the Court concluded, because section 2's exemption would have otherwise been meaningless. *Id.* at 425–26, 88 S.Ct. at 2195–96.

An identical analysis can be applied to the 1870 Act, which had the same structure. Section 16 of the 1870 Act was followed by section 17, which stated:

That any person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by the last preceding section of this act ... shall be deemed guilty of a misdemeanor....

Voting Rights Act of 1870, ch. 114, § 17, 16 Stat. 140 (1870). Section 17, like section 2 of the 1866 Act, exempted private violations of section 16 from the criminal sanctions it imposed. Section 16, thus, must have applied to private discrimination because section 17's exemption would otherwise have been meaningless. As a result, the structure of the 1870 Act indicates just as strongly that section 16 of the 1870 Act applies to private discrimination as the structure of the 1866 Act indicated in *Jones* that section 1 of the 1866 Act applied to private discrimination.

GEICO attempts to convince us that section 16 of the 1870 Act did not prohibit private discrimination by calling to our attention legislative history of that section allegedly illustrating that Congress intended only to bar public discrimination. GEICO points out that in introducing the bill of which § 16 was a part, Senator Stewart, the bill's sponsor, was given "leave to introduce a bill ... to secure to all persons the equal protection of the laws." Cong. Globe, 41st Cong., 2d Sess. 323 (1870). Senator Stewart stated in debate that "[t]his [bill of which § 16 was a part] simply extends to foreigners, not citizens, the equal protection of our laws where the State laws deny them the equal civil rights enu-

merated in [§ 16]." *Id.* at 1536. Further, he described at one point the purpose of his bill:

> to wipe out to some extent the infamy that rests upon this nation for having invited the Asiatics to come here, having made treaties for their protection, and then allowed *a State in this Union to pass barbarous and cruel laws,* to place upon them unjust and cruel burdens, to tax them differently from other people, and collect that tax in a brutal manner.

*Id.* at 3807 (emphasis added). In addition, Senator Sherman, discussing the bill, stated: "I am not sure but that after discussion I would agree with the Committee on the Judiciary, that we must protect the Chinese against the local laws of California." *Id.* at 3570. Along the same lines, Representative Bingham, a floor manager for the bill in the House, indicated that the "effect" of the bill was to ensure that "immigrants ... shall ... be entitled to equal protection of the laws." *Id.* at 3871.

We reject for two reasons GEICO's argument that the legislative history it cites demonstrates that section 16 of the 1870 Act does not apply to private discrimination. First, the statements in the legislative history to which GEICO refers fall far short of persuading us to ignore that the language of section 16 of the 1870 Act and the structure of the 1870 Act mirror almost exactly the language of section 1 of the 1866 Act and the structure of the 1866 Act, which the Court in *Jones* and *McCrary* found to demonstrate conclusively that section 1 of the 1866 Act prohibited private discrimination. Second, Duane and *amici* identify other statements in the legislative history showing that Congress intended section 16 of the 1870 Act to prohibit private discrimination. For example, Senator Stewart stated with respect to his bill:

> We have pledged the honor of the nation that [Chinese people] may come and shall be protected. For twenty years, every obligation of humanity, of justice, and of common decency toward those people has been *violated by a certain class of men— bad men I know; but they are violated in California and on the Pacific coast.* ...
> I do here insist that that provision shall go on this bill, and that the pledge of this nation shall be redeemed, that we will protect Chinese aliens or any other aliens whom we allow to come here....

*Id.* at 3658 (emphasis added). This concern about private discrimination was echoed in the debate on the bill by Senator Pool, who stated: "If a state shall not enforce its laws by which *private individuals shall be prevented by force from contravening the rights of the citizen* under the amendment, it is in my judgment the duty of the United States government to supply that omission...." *Id.* at 3611 (emphasis added). Further, Senator Stewart indicated that "[§ 16] extends the operation of the civil rights bill [of 1866] ... to all persons within the jurisdiction of the United States," *id.* at 1536, and the Supreme Court has determined that Congress intended the 1866 Act to prohibit private discrimination. *Jones,* 392 U.S. at 426, 88 S.Ct. at 2196.[3]

We therefore hold, based on *Jones* and *McCrary,* that section 16 of the 1870 Act prohibited private discrimination against aliens. As section 16 was codified without substantive change in section 1981 prior to

---

**3.** GEICO also contends that section 16 of the 1870 Act should not be interpreted to apply to private discrimination, even if section 1 of the 1866 Act is so interpreted, because section 16 was enacted pursuant to the Fourteenth Amendment, which prohibits only public discrimination, while section 1 of the 1866 Act was enacted pursuant to the Thirteenth Amendment, which prohibits both public and private discrimination. This contention is flawed in several respects. While the Fourteenth Amendment itself prohibits only public discrimination, laws passed pursuant to the Fourteenth Amendment can reach private discrimination as well. *District of Columbia v. Carter,* 409 U.S. 418, 424 n. 8, 93 S.Ct. 602, 606

n. 8, 34 L.Ed.2d 613 (1973). And even if Congress did intend the prohibition of section 16 of the 1870 Act to be coextensive with the Fourteenth Amendment's prohibition, it was probably unaware in 1870 that the Fourteenth Amendment applied only to state action because this was not established until thirteen years later, in *Civil Rights Cases,* 109 U.S. 3, 11, 3 S.Ct. 18, 21, 27 L.Ed. 835 (1883). Finally, it is unlikely that Congress would have "pattern[ed] [section 16] after" section 1 of the 1866 Act, *Hurd,* 334 U.S. at 31 n. 8, 68 S.Ct. at 851 n. 8, if it intended section 16 to have a narrower scope than section 1.

section 1981's amendment by section 101 of the 1991 Civil Rights Act, we conclude that pre-amendment section 1981 prohibited private discrimination against aliens.

Our conclusion is supported by an additional reason as well. As discussed above, pre-amendment section 1981 codified into a single provision section 16 of the 1870 Act, from which the prohibition against alien discrimination originated, and a portion of section 1 of the 1866 Act, from which the prohibition against race discrimination originated; this single provision read:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens....

42 U.S.C. § 1981. The Supreme Court has interpreted this single provision's guarantee that "[a]ll persons within the jurisdiction of the United States shall have the same right ... make and enforce contracts ... as is enjoyed by white citizens" to give blacks protection against private discrimination in the making of contracts. *McCrary*, 427 U.S. at 170–71, 96 S.Ct. at 2594–95. It would be strange indeed to hold, as GEICO asks us to here, that this same grant of rights to "all persons within the jurisdiction of the United States" does not also confer on aliens protection against private discrimination in the making of contracts—under the plain language of the provision, "all persons," blacks and aliens, receive the same protection against discrimination. *See McCrary*, 427 U.S. at 206, 96 S.Ct. at 2611 (White, J., dissenting) ("[Section 1981] draws no such distinction between classes of persons. It logically must be construed either to give 'all

persons' a right not to be discriminated against by private parties in the making of contracts or to give no persons such a right."); *Bhandari v. First Nat'l Bank of Commerce*, 829 F.2d 1343, 1350 (5th Cir. 1987) (*en banc*) ("[C]onstruing the same language [of section 1981] to mean one thing as applied to one subset of 'persons'—blacks—and another as applied to a different one—foreign nationals—is awkward and undesirable.").

We recognize that, despite the passage quoted above, the Fifth Circuit held in *Bhandari* that section 1981, prior to its amendment by the 1991 Civil Rights Act, did not prohibit private discrimination against aliens. *Id.* at 1351–52.[4] The Court in *Bhandari*, however, explicitly based its holding on its strong and expressed disagreement with the Court's holdings in *Jones* and *McCrary*, see, e.g., *id.* at 1349 ("For the reasons stated by Justice White in his *McCrary* dissent, and echoed by most observers who take the view that words have an ascertainable meaning, it seems to us beyond serious dispute that the reasoning of *Jones* and *McCrary* cannot stand of its own force."), and its conclusion that it was not "obliged to extend [the] reasoning [of *Jones* and *McCrary*] ... to a new series of situations to which the Court has not yet spoken," *id.* As Judge Higginbotham noted in his *Bhandari* concurrence, as an inferior court we are not "free to strip content from principle by confining the Supreme Court's holding[s] to the precise facts before [us]," *id.* at 1352. For the reasons stated above, we conclude that regardless of whether we agree or disagree with *Jones* and *McCrary*, their holdings compel us to find that section 1981 prohibits private discrimination against aliens. With respect, then, we must disagree with the Fifth Circuit's decision in *Bhandari*.

---

4. After the Supreme Court reaffirmed *Jones*'s interpretation of the 1866 Act in *Patterson*, the Court granted *certiorari* in *Bhandari*, vacated the judgement, and remanded the case to the Fifth Circuit for reconsideration in light of *Patterson*. *Bhandari v. First Nat'l Bank of Commerce*, 492 U.S. 901, 109 S.Ct. 3207, 106 L.Ed.2d 558 (1989). The Fifth Circuit found that *Patterson* did not alter its result and reinstated its previous decision. *Bhandari v. First Nat'l Bank of Commerce*, 887 F.2d 609, 610 (5th Cir.1989). The

Supreme Court then denied *certiorari*, *Bhandari v. First Nat'l Bank of Commerce*, 494 U.S. 1061, 110 S.Ct. 1539, 108 L.Ed.2d 778 (1990), over the dissent of Justices White and O'Connor, who stated that they "would grant the petition because it [was] not clear ... that § 1981 should be construed to prohibit private, as well as official, discrimination on the basis of race, but to prohibit only governmental discrimination on the basis of alienage," *id.* at 1062, 110 S.Ct. at 1540.

Because we conclude that section 1981 prohibits private discrimination against aliens, we determine that the district court properly denied GEICO's motion to dismiss Duane's claim.

### IV

For the reasons stated, we affirm the district court's denial of GEICO's motion to dismiss.

*AFFIRMED.*