Jane CHACKO, Plaintiff,

v.

TEXAS A & M UNIVERSITY, E. Dean Gage, Benton Cocanougher, Emily Ashworth, Violetta Burke Cook, and Suzanne Droleskey, Defendants.

Civil Action No. H–95–4637.

United States District Court, S.D. Texas.

April 4, 1997.

Malcolm Greenstein, Greenstein & Kolker, Austin, TX, for Plaintiff.

Suzanne Sturdivant Jones, Office of Attorney General, Austin, TX, for Defendants Texas A&M University, E. Dean Gage, Benton Cocanougher, Emily Ashworth and Suzanne Droleskey.

Leslie B. Vance, Office of Attorney General, Austin, TX, for Defendant Violetta Burke Cook.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court is Defendants Texas A & M University ("TAMU"), E. Dean Gage ("Gage"), Benton Cocanougher ("Cocanougher"), Emily Ashworth ("Ashworth"), and Suzanne Droleskey's ("Droleskey") Motion for Summary Judgment (# 28). These defendants seek summary judgment on Plaintiff Jane Chacko's ("Chacko") claims alleging discrimination under 42 U.S.C. § 1981, 42 U.S.C. § 1983, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Defendant Violetta Burke Cook ("Cook") has not moved for summary judgment as to the claims asserted against her.

Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, this court is of the opinion that the motion for summary judgment should be granted in part and denied in part.

## I. *Background*

In May 1993, Chacko, who is a Canadian citizen, began volunteering at TAMU's International Student Services ("ISS") Office in the Sponsored Student Program. At the time, the position of Sponsored Student Specialist in the Sponsored Student Program was vacant. The position of Sponsored Student Specialist entails assisting foreign students who are attending TAMU. In July 1993, Defendant Cook, the Coordinator of Sponsored Student Programs, and Defendant Droleskey, the Director of International Student Affairs and Cook's supervisor, met with Chacko and expressed an interest in hiring her. Because Chacko did not possess the requisite H–1B visa that would permit her to be employed in the United States, Droleskey instructed Cook to determine whether Chacko was eligible for employment and the steps for obtaining a work visa.

On August 2, 1993, Cook sent a letter to Chacko "officially [offering her] the position of Sponsored Student Specialist." The letter included a list of the duties of the position, the salary—$23,120.00, the period of employment—three years, and the start date—October 1, 1993. Cook prepared the letter as part of the paperwork to be submitted to the Immigration and Naturalization Service ("INS") to obtain a work visa for Chacko. Droleskey claims that she was unaware of this letter until November 12, 1993, when Kathryn J. Sands ("Sands"), the Immigration Service Manager at TAMU, informed her of it.

Droleskey sought and was given permission by Defendant Ashworth, Assistant Provost for International Programs and Droleskey's supervisor, to increase the salary of the Sponsored Student Specialist by $120.00 per year to conform with the INS's salary requirements for the hiring of a foreign national in a specialized position. On or about August 27, 1993, TAMU sent all the necessary documents to the INS to enable Chacko to obtain her visa. These documents included: (1) the August 2 employment letter; (2) an application for a visa which stated the "dates of [her] intended employment" and an annual salary of $23,120.00; and (3) a signed Return Transportation Statement authorized

by Droleskey, ensuring the "employer would be liable for the reasonable costs of return transportation of the alien if the alien is dismissed from employment by the employer before the end of the period."

In mid-September, Chacko traveled to Vancouver, Canada, at her own expense to complete the visa process. On or about September 20, 1993, Chacko returned from Canada with her approved H–1B visa, which allowed her to begin work October 1, 1993. During that same period, an anonymous letter was sent to United States Congressman Jack Fields ("Congressman Fields") complaining that the ISS office had not followed TAMU's hiring procedure in hiring Chacko. The anonymous letter stated that the Sponsored Student Specialist position was not properly posted, that no applications were accepted, and that "the person responsible for hiring someone for this position opted to arrange for this volunteer worker to obtain an H1–B visa." Specifically, the letter observed:

> The point in question is that there was never an opportunity for this position to be offered to an American citizen as the position was never posted or advertised and that by arranging for this H1B [sic] visa there is another U.S. citizen that could possibly have been qualified for the position out of a job at job [sic] paying $23,000 a year.

Subsequently, Congressman Fields wrote the INS, which then forwarded a copy of the anonymous letter to TAMU.

Between September 20 and October 1, Chacko, allegedly unknown to Droleskey or Cook, completed TAMU employment paperwork for the ISS office and gave written authorization for the direct deposit of her paychecks. During the same time period, Droleskey realized that the position had been posted only half a day in violation of TAMU's policy that a position be posted for a minimum of one week. Consequently, Droleskey told Cook to reopen the Sponsored Student Specialist position with TAMU Human Resources. Droleskey also informed Chacko that the position was being posted again in conformance with TAMU policy. Chacko agreed to this procedure with the under-

standing that she would have to go through the interview process and that there was a possibility that she might not be hired for the position. As a result, the TAMU employment paperwork that Chacko had previously completed was not acted upon.

After the position was reopened and applications were accepted, in late October, Cook and Droleskey chose to interview Chacko as well as two other qualified candidates. According to the defendants, by this time, Droleskey and Cook were aware that Chacko had received her visa, and they considered her the most qualified of the candidates. According to Chacko, on November 8, Cook offered her the position by telephone and advised her that she would begin work on November 10. Chacko also claims that later that same day Droleskey personally congratulated her on receiving the position.

In a meeting on the morning of November 10, 1993, Droleskey announced to the ISS staff either that she "would be hiring" Chacko or that she had already "hired" her. After the announcement, an ISS staff member, David Smotek ("Smotek") complained that Chacko should "not be" or should "not have been" hired. Nathena Watkins ("Watkins"), another ISS staff member, stated in her deposition that Smotek said that it was "unfair and un-American to hire a foreigner." The defendants claim, however, that Smotek complained that Chacko had been offered the position at a earlier date, when she had not obtained the required visa, and that such procedure was against TAMU's hiring policy. Chacko argues that she was hired twice— once by the August 2 letter and again on November 8, while the defendants contend that they were still in the hiring process and she was never hired. Chacko maintains that she began work on November 10, but Droleskey told her to leave later that day because there had been a complaint that a foreigner had been hired.

The defendants assert that on November 12, 1993, Droleskey initiated an investigation of Smotek's complaints. Droleskey's supervisor, Ashworth, confirmed the decision to investigate the matter and decided to suspend the hiring process for the Sponsored Student Specialist position. In late Novem-

ber or early December, Chacko attempted to discuss the situation with Droleskey, who suggested she speak with Ashworth. At her meeting with Ashworth, Chacko claims that Ashworth confirmed that Chacko had been hired but stated that she was "closing" the Sponsored Student Specialist position.

Next, Chacko went to the Interim President of TAMU, Defendant Gage, but she was directed to speak with the Vice President, Defendant Cocanougher. On December 3, 1993, Chacko spoke with and answered questions allegedly posed by Cocanougher and Ruth Prescott ("Prescott"), whom she later learned was an attorney representing TAMU. Chacko claims that at the close of the meeting, Cocanougher promised to telephone her the following Monday, but he never did. Chacko asserts that she was never provided a hearing or given a reasonable explanation for TAMU's actions. Chacko alleges that when she learned she had been fired from the position described in her visa, she had no choice but to break her apartment lease and return to Canada in December 1993.

On January 5, 1993, Droleskey sent a memorandum to Gage through Cocanougher and Ashworth, requesting that Tonya Yurgensen–Jacks ("Yurgensen–Jacks"), who was employed by TAMU as a clerk, be appointed the interim Sponsored Student Specialist for one year, from February 1, 1994, to January 31, 1995, at a salary of $20,000.00. Yurgensen–Jacks, a United States citizen, became the interim Sponsored Student Specialist and, eventually, after posting the position, interviewing, and ranking the applicants, TAMU hired her as the permanent Sponsored Student Specialist.

Chacko filed a charge with the Equal Employment Opportunity Commission ("EEOC") on March 2, 1994, alleging that she had been discriminated against on the basis of her national origin. Chacko initiated this action on September 27, 1995, alleging national origin discrimination. Chacko claims that TAMU violated her rights under Title VII, for which she seeks equitable relief and damages. Chacko alleges that the individual defendants violated 42 U.S.C. §§ 1981 and 1983, by discriminating against her on

the basis of her national origin as well as depriving her of a protected property interest in her continued employment at TAMU for the term of her contract. Chacko contends that the actions of the individual defendants were willful and malicious, entitling her to punitive, as well as compensatory, damages.

## II. *Analysis*

### A. *The Standard for Summary Judgment*

Rule 56(c) provides that "[summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(C). The parties seeking summary judgment bear the initial burden of informing the court of the basis for their motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which they believe demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Williams v. Adams,* 836 F.2d 958, 960 (5th Cir.1988). The moving parties, however, need not negate the elements of the non-movant's case. See *Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir.1996); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994).

Once a proper motion has been made, the non-moving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial. See *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514–15; *Wallace,* 80 F.3d at 1047; *Little,* 37 F.3d at 1069, 1075. The controverted evidence must be viewed in the light most favorable to the non-movant, and all reasonable doubts must be resolved against the moving party. See *Palmer v. BRG of*

*Ga., Inc.,* 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 402 n. 5, 112 L.Ed.2d 349 (1990); *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14; *Judwin Properties, Inc. v. United States Fire Ins. Co.,* 973 F.2d 432, 435 (5th Cir.1992). Nevertheless, "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden." *See Douglass v. United Services Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996) (citing *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994)); *Wallace,* 80 F.3d at 1047; *Little,* 37 F.3d at 1075. Summary judgment is mandated if the non-movant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *See Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2552. "In such situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2552.

### B. *Title VII and § 1981*

#### 1. *Burden of Proof*

■ Title VII provides that "[i]t shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individuals's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). "Section 1981 provides that all persons in the United States shall have the same contractual rights as 'white citizens.'" *LaPierre v. Benson Nissan, Inc.,* 86 F.3d 444, 448 n. 2 (5th Cir.1996); *see also* 42 U.S.C. § 1981(a). More specifically, § 1981 states that every person in the United States shall have the

same rights as white citizens regarding "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. § 1981(b). In *McDonnell Douglas* and *Burdine,* the United States Supreme Court outlined the burden-shifting framework generally applicable in Title VII and § 1981 cases.[1] *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

■ Where, as here, there is no direct evidence of discrimination, a plaintiff must initially establish a *prima facie* case by satisfying a multi-element test from which discriminatory motive may be inferred, thus creating a rebuttable presumption of intentional discrimination. *See Wallace,* 80 F.3d at 1047 (citing *Meinecke v. H & R Block of Houston,* 66 F.3d 77, 83 (5th Cir.1995)); *Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082, 1087 (5th Cir.1994) (citing *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94). Because, in the case at bar, there is a dispute as to whether Chacko was improperly discharged or was not hired, an analysis under both tests is necessary. To establish a *prima facie* case of discriminatory discharge, Chacko must show:

(1) she is a member of a protected group;

(2) she was qualified for the position in question;

(3) she was discharged from the position; and

(4) she was replaced by someone outside the protected group.

*See Meinecke,* 66 F.3d at 83; *Portis v. First Nat'l Bank of New Albany,* 34 F.3d 325, 328 n. 6 (5th Cir.1994); *Jatoi v. Hurst–Euless–Bedford Hosp. Auth.,* 807 F.2d 1214, 1219

---

1. Absent direct evidence of discriminatory intent, the McDonnell Douglas burden-shifting framework applies to § 1981 claims. *See Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989); *LaPierre,* 86 F.3d at 448 n. 2; *see also Wallace,* 80 F.3d at 1047–48. The Fifth Circuit has regarded the elements of § 1981 claims to be sufficiently similar to those of Title VII actions to warrant the same analysis in many instances.

*See Anderson v. Douglas & Lomason Co.,* 26 F.3d 1277, 1284 n. 7 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1099, 130 L.Ed.2d 1066 (1995); *see also LeJeune v. Avondale Indus., Inc.,* No. 95–2600, 1996 WL 225029, at *3 (E.D.La. May 1, 1996), *aff'd,* 103 F.3d 125 (5th Cir.1996). Therefore, for purposes of this analysis, the same burden-shifting framework will be utilized with respect to Chacko's claims under both Title VII and § 1981.

(5th Cir.), *modified in part on reh'g,* 819 F.2d 545 (5th Cir.1987), *cert. denied,* 484 U.S. 1010, 108 S.Ct. 709, 98 L.Ed.2d 660 (1988). Alternatively, Chacko may establish a *prima facie* case by showing that she is a member of a protected class, she was qualified for the position, and persons outside of the class were treated more favorably than she. *See Nieto v. L & H Packing Co.,* 108 F.3d 621, 623 n. 5 (5th Cir.1997); *Waggoner v. City of Garland,* 987 F.2d 1160, 1163 (5th Cir.1993); *Johnson v. Chapel Hill Indep. Sch. Dist.,* 853 F.2d 375, 381 (5th Cir.1988); *Thornbrough v. Columbus & Greenville R.R. Co.,* 760 F.2d 633, 639 (5th Cir.1985). In order for Chacko to establish a *prima facie* case of failure to hire, she must establish:

(1) she is a member of a protected group;

(2) she applied for a position;

(3) she was qualified for the position for which she applied;

(4) she was not selected for the position; and

(5) after the defendant declined to hire her, the position either remained open or someone outside the protected group was selected to fill it.

*See Davis,* 14 F.3d at 1087 (citing *Plemer v. Parsons–Gilbane,* 713 F.2d 1127, 1135 (5th Cir.1983)).

Once the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to articulate—but not prove—a legitimate, nondiscriminatory reason for its employment decision. *See McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824; *see also Davis,* 14 F.3d at 1087; *Marcantel v. Department of Transp. & Dev.,* 37 F.3d 197, 199 (5th Cir. 1994). If the employer meets its burden, the *prima facie* case is dissolved, and the burden shifts back to the plaintiff to establish that the reason proffered by the employer is merely a pretext for discrimination. *See McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824; *Marcantel,* 37 F.3d at 200; *Moham v. Steego Corp.,* 3 F.3d 873, 875 (5th Cir.1993), *cert. denied,* 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994). To demonstrate a "pretext for discrimination," the plaintiff must show both that the employer's proffered reason was false and that prohibited discrimination was the real reason for the employer's decision. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 2751–52, 125 L.Ed.2d 407 (1993).

The Fifth Circuit has formulated the plaintiff's burden under *St. Mary's Honor Ctr.* as one of establishing that the employer's nondiscriminatory reason is not credible and that an unlawful discriminatory intent motivated the employer's action. *See Ray v. Iuka Special Mun. Separate Sch. Dist.,* 51 F.3d 1246, 1249 (5th Cir.1995). "Under *Hicks,* '[i]t is not enough, in other words, to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.'" *Id.* (quoting *St. Mary's Honor Ctr.,* 509 U.S. at 519, 113 S.Ct. at 2753–54). "The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive." *Mayberry v. Vought Aircraft Co.,* 55 F.3d 1086, 1091 (5th Cir.1995); *accord Odom v. Frank,* 3 F.3d 839, 850 (5th Cir.1993); *Little v. Republic Ref. Co.,* 924 F.2d 93, 97 (5th Cir.1991). In the context of a motion for summary judgment, "[a] jury issue will be presented and a plaintiff can avoid summary judgment ... if the evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons actually motivated the employer and (2) creates a reasonable inference that [citizenship] was a determinative factor in the actions of which the plaintiff complains." *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 994 (5th Cir.1996). At all times, the plaintiff has the ultimate burden to prove intentional discrimination. *See St. Mary's Honor Ctr.,* 509 U.S. at 507, 113 S.Ct. at 2747; *Marcantel,* 37 F.3d at 200. The burden-shifting approach may be dispensed with altogether, however, if the plaintiff is able to establish intentional discrimination by direct evidence of discriminatory motive. *See Wallace,* 80 F.3d at 1047–48; *Kendall v. Block,* 821 F.2d 1142, 1145 (5th Cir.1987); *Ramirez v. Sloss,* 615 F.2d 163, 168 (5th Cir.1980).

Nevertheless, an employee's own subjective belief of discrimination, no matter how genuine, cannot serve as the basis for judicial relief. *See, e.g., Nichols v. Loral Vought Sys. Corp.,* 81 F.3d 38, 42 (5th Cir.

1996); *Douglass,* 79 F.3d at 1429; *Ray v. Tandem Computers, Inc.,* 63 F.3d 429, 434 (5th Cir.1995); *Armendariz v. Pinkerton Tobacco Co.,* 58 F.3d 144, 152–53 (5th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 709, 133 L.Ed.2d 664 (1996); *Grizzle v. Travelers Health Network, Inc.,* 14 F.3d 261, 268 (5th Cir.1994); *Molnar v. Ebasco Constructors, Inc.,* 986 F.2d 115, 119 (5th Cir.1993); *Little v. Republic Ref. Co.,* 924 F.2d 93, 96 (5th Cir.1991). Although Title VII protects employees against racial discrimination in their terms and conditions of employment, it does not afford minorities special preferences or place upon the employer an affirmative duty to accord them special treatment. *See Williams v. General Motors Corp.,* 656 F.2d 120, 129 (5th Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982). Furthermore, the employment discrimination laws are "not intended to be a vehicle for judicial second-guessing of business decisions, nor ... to transform the courts into personnel managers." *EEOC v. Louisiana Office of Community Servs.,* 47 F.3d 1438, 1448 (5th Cir.1995) (citing *Bienkowski v. American Airlines, Inc.,* 851 F.2d 1503, 1507–08 (5th Cir.1988)); *Bodenheimer v. PPG Indus., Inc.,* 5 F.3d 955, 959 (5th Cir. 1993); *see also Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978); *Waggoner,* 987 F.2d at 1165; *Thornbrough,* 760 F.2d at 647.

### 2. *Title VII Claim Against TAMU*

■ "The term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 88, 94 S.Ct. 334, 336, 38 L.Ed.2d 287 (1973). In *Espinoza,* the United States Supreme Court determined that Congress did not intend for the term "national origin" to embrace citizenship requirements. *See id.* at 88–91, 94 S.Ct. at 336–37. The court acknowledged, however, that there may be many situations where discrimination on the basis of citizenship would have the effect of discriminating on the basis of national origin. *See id.* at 92, 94 S.Ct. at 337–38. The court, therefore, held that Title VII "prohibits discrimination on the basis of citizenship whenever it has the purpose or effect of discriminating on the basis of national origin." *Id.; accord Lemnitzer v. Philippine Airlines, Inc.,* 52 F.3d 333, 1995 WL 230404, at \*2 (9th Cir.1995). In *Espinoza,* the court noted:

> Certainly it would be unlawful for an employer to discriminate against aliens because of race, color, religion, sex, or national origin—for example, by hiring aliens of Anglo–Saxon background but refusing to hire those of Mexican or Spanish ancestry. Aliens are protected from illegal discrimination under the Act [Title VII], but nothing in the Act makes it illegal to discriminate on the basis of citizenship or alienage.

414 U.S. at 95, 94 S.Ct. at 340; *see also Fortino v. Quasar Co.,* 950 F.2d 389, 391–92 (7th Cir.1991). The Fifth Circuit similarly concluded that "[n]ational origin must not be confused with ethnic or sociocultural traits or an unrelated status, such as citizenship or alienage...." *Garcia v. Gloor,* 618 F.2d 264, 269 (5th Cir.1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981) (citing *Espinoza,* 414 U.S. at 94, 94 S.Ct. at 339).

Here, although Chacko's claim for relief under Title VII against TAMU is entitled "national origin discrimination," in actuality, Chacko is asserting citizenship discrimination, as reflected by a number of the allegations in her first amended complaint. In ¶ 4 under "Parties," Chacko identifies herself as a "Citizen of Canada." In ¶¶ 12, 14, 15, and 16 of the "Facts" section of her complaint, Chacko asserts:

> 12. On or about September 30, 1993, Defendants Cook and Droleskey rescinded Plaintiff's employment contract in response to a complaint by an employee of the International Student Services that the position was being filled by a person who was not a United States citizen.

> 14. On November 10, 1993, Plaintiff began work, but after approximately an hour and a half, Defendant Droleskey, with the concurrence of Defendant Ashworth, fired the Plaintiff, once again in response to a complaint that Plaintiff was not a United States citizen.

15. Subsequently, Defendants Droleskey and Ashworth hired a United States citizen who was less qualified than the Plaintiff as the Sponsored Student Specialist.

16. On information and belief Plaintiff alleges that Defendants Gage, Cocanougher and Ashworth participated in the decision to terminate the Plaintiff from her employment and/or refused to reinstate the Plaintiff after they were advised that she was terminated because she was not a citizen of the United States.

Nowhere in her complaint or in her response to the defendants' motion for summary judgment does Chacko identify or discuss her national origin; nor does Chacko advance any reason other than her citizenship for her alleged termination. Thus, it is apparent that Chacko's Title VII claim is based upon her citizenship and not her national origin. Consequently, Chacko is unable to satisfy the first element of a *prima facie* case—membership in a protected class. Because citizenship discrimination does not fall within the ambit of Title VII, TAMU is entitled to summary judgment.

### 3. *Section 1981 Claim Against Individual Defendants*

#### a. *Citizenship Discrimination*

■ Chacko's § 1981 claim, like her Title VII claim, is entitled "national origin discrimination." Chacko again, however, neither identifies her national origin nor adduces facts suggesting that she was terminated or was not hired due to her national origin. Instead, as noted above, her complaint avers nothing more than a claim based on her status as a noncitizen. The defendants argue that because Chacko has failed to provide any information concerning her national origin or race, she cannot prove that their alleged discrimination against her was based on her membership in a group protected under § 1981.

It is well settled that § 1981 prohibits private, as well as official, discrimination on the basis of race or national origin. *See Patterson*, 491 U.S. at 171–72, 109 S.Ct. at 2369–70; *Runyon v. McCrary*, 427 U.S. 160,

173–75, 96 S.Ct. 2586, 2595–97, 49 L.Ed.2d 415 (1976); *see also Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 613, 107 S.Ct. 2022, 2028, 95 L.Ed.2d 582 (1987); *Bullard v. OMI Ga., Inc.*, 640 F.2d 632, 634–35 (5th Cir.1981); *Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968, 970–71 (10th Cir.1979); *Alvarado v. El Paso Indep. Sch. Dist.*, 445 F.2d 1011 (5th Cir.1971), *aff'd*, 593 F.2d 577 (5th Cir.1979). Supreme Court precedent also establishes that § 1981 prohibits official discrimination against aliens. *See Graham v. Richardson*, 403 U.S. 365, 377, 91 S.Ct. 1848, 1854–55, 29 L.Ed.2d 534 (1971) (citing *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 & n. 7, 68 S.Ct. 1138, 1143 & n. 7, 92 L.Ed. 1478. (1948)); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070–71, 30 L.Ed. 220 (1886). The Supreme Court, however, has not addressed whether § 1981 prohibits private discrimination on the basis of citizenship.

With respect to Chacko's claim against the defendants in their individual capacities, the defendants cite *Bhandari v. First Nat'l Bank of Commerce* for the proposition that the protections of § 1981 do not extend to citizenship or alienage discrimination. *See* 829 F.2d 1343, 1350–52 (5th Cir.1987), *vacated*, 492 U.S. 901, 109 S.Ct. 3207, 106 L.Ed.2d 558 (1989), *reinstated on remand*, 887 F.2d 609 (5th Cir.1989), *cert. denied*, 494 U.S. 1061, 110 S.Ct. 1539, 108 L.Ed.2d 778 (1990). Construing the pre–1991 version of § 1981, the Fifth Circuit held in *Bhandari* that the protections of § 1981 do not extend to prohibit alienage discrimination by private persons, despite Supreme Court authority that racial discrimination by such persons is prohibited under § 1981. *See id.* at 1351–52; *but see Duane v. GEICO*, 37 F.3d 1036, 1043–44 (4th Cir.1994), *cert. dismissed*, —— U.S. ——, 115 S.Ct. 2272, 132 L.Ed.2d 253 (1995) (private discrimination against aliens prohibited). The Fifth Circuit expressed its disagreement with the Supreme Court's holdings in *Jones* and *McCrary*. *See Bhandari*, 829 F.2d at 1348–50 (citing *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 413, 88 S.Ct. 2186, 2189, 20 L.Ed.2d 1189 (1968); *McCrary*, 427 U.S. at 170–75, 96 S.Ct. at 2594–97).[2] After consid-

---

**2.** In *Jones*, the Supreme Court held that § 1982 a companion to § 1981 governing rights in proper-

ering the origins of the statute, the Fifth Circuit questioned the extension of § 1981 to proscribe discrimination by private persons. *See id.* at 1350.

The defendants' reliance on *Bhandari,* however, is misplaced, as that decision construed § 1981 prior to its amendment in 1991. Section 1981(c) was added by the Civil Rights Act of 1991, which governs conduct occurring after November 1991. *See Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 311–15, 114 S.Ct. 1510, 1519–20, 128 L.Ed.2d 274 (1994). The amended version of § 1981 applies to Chacko's claim, which arose in 1993. Section 1981(c) provides, "The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c).

The enactment of § 1981(c) in 1991 "mooted the arguments made in *Bhandari* and *Duane* over whether Congress ... meant to prohibit private discrimination." *Cheung v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 913 F.Supp. 248, 251 (S.D.N.Y.1996). As the court reasoned in *Cheung:*

> [w]hen Congress enacted section 1981(c), it was well-established that section 1981 prohibited public discrimination on the basis of citizenship. Section 1981 does not exempt private citizenship from its coverage, nor is there evidence in the legislative history that Congress did not intend to prohibit private citizenship discrimination. Accordingly, section 1981 must be construed to prohibit private discrimination on the basis of citizenship.

*Id.* Because there is no indication that § 1981 extends only to governmental discrimination on the basis of alienage, § 1981(c) states that the statute proscribes nongovernmental discrimination, and the Fifth Circuit has not addressed the issue with respect to the amended version of the statute, Chacko's § 1981 action against the defendants in their individual capacities based on her status as an alien is not foreclosed.

### b. *Prima Facie Case*

"To establish a *prima facie* case under section 1981, a plaintiff must produce direct or circumstantial evidence of purposeful discrimination by the defendant." *Jatoi,* 807 F.2d at 1219 (citing *Ramirez,* 615 F.2d at 168). As previously noted, the criteria set forth in *McDonnell Douglas Corp.* are sufficient to establish a *prima facie* case under § 1981 based on circumstantial evidence. *See id.; see also Wallace,* 80 F.3d at 1047 (citing *Meinecke,* 66 F.3d at 83); *Davis,* 14 F.3d at 1087 (citing *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94).

■■■ In the case at bar, Chacko, as a noncitizen, is a member of a protected class under § 1981. *See Graham,* 403 U.S. at 377, 91 S.Ct. at 1854–55; *Takahashi,* 334 U.S. at 419 n. 7, 68 S.Ct. at 1143 n. 7. Chacko was unquestionably qualified for the position at issue. At her deposition, Cook testified that Chacko was the most qualified applicant and ranked number one. With respect to the third or fourth element, it is undisputed that Chacko was not hired by TAMU or was discharged from the position of Sponsored Student Specialist. Finally, Chacko has demonstrated that TAMU hired an individual outside the protected class, Yurgensen–Jacks, a United States citizen, to fill the position. Thus, Chacko has adduced sufficient evidence to establish a *prima facie* case of citizenship discrimination.

### c. *Legitimate, Nondiscriminatory Reason*

■■■ The defendants have articulated a legitimate, nondiscriminatory reason for their actions—the hiring process for the Sponsored Student Specialist position was deferred in order to initiate an investigation into claims made by Smotek regarding irregularities in the application procedure with respect to Chacko.

### d. *Pretext*

The next inquiry, therefore, is whether the proffered reason is merely pretextual. A plaintiff may succeed in demonstrating pre-

---

ty—bars all racial discrimination, private as well as public, in the sale or rental of property. *See* 392 U.S. at 413, 88 S.Ct. at 2189. Subsequently, in *McCrary,* the Supreme Court applied the rea-

soning of *Jones* to § 1981, holding that racial discrimination in matters of private contracts was generally forbidden by § 1981. *See* 427 U.S. at 173–74, 96 S.Ct. at 2595–96.

text " 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' " *Marcantel,* 37 F.3d at 199 (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095). According to the deposition testimony of Watkins, when Droleskey announced in the morning meeting on November 10, 1993, that Chacko had been or was being hired, Smotek "blew up." When Watkins was questioned as to what Smotek said, she responded:

> I really tried to block this out of my mind. He was just very angry and felt that it was unfair and un-American to hire a foreigner and that other people—Americans were more qualified or at least should have been given the position.

Moreover, Chacko stated in her deposition that Droleskey told her that "a formal complaint had been lodged and that there was a problem with my being a foreigner." From these comments, it could be inferred that TAMU's articulated reason for its actions toward Chacko was merely a pretext for alienage discrimination. Thus, fact issues remain with respect to why Chacko either was terminated or was not hired by TAMU. Accordingly, in the absence of an affirmative defense, summary judgment is not appropriate, and Chacko may proceed to trial on her § 1981 claim of citizenship discrimination.

### C. *Section 1983 Claims Against the Individual Defendants*

Chacko claims that she was denied due process and equal protection of the laws under the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

 Section 1983 provides a vehicle for redressing the violation of federal law by those acting under color of state law. *See Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 19, 101 S.Ct. 2615, 2625–26, 69 L.Ed.2d 435 (1981); *Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980). Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights conferred else-

where. *See Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 811–12, 127 L.Ed.2d 114 (1994). To prevail on a § 1983 claim, the plaintiff must prove that a person acting under color of state law deprived her of a right secured by the Constitution or laws of the United States. *See* 42 U.S.C. § 1983; *Daniels v. Williams,* 474 U.S. 327, 330, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986); *Augustine v. Doe,* 740 F.2d 322, 324 (5th Cir. 1984). The plaintiff must support her § 1983 claim with specific facts demonstrating a constitutional deprivation and may not simply rely on conclusory allegations. *See Schultea v. Wood,* 47 F.3d 1427, 1433 (5th Cir.1995); *Fee v. Herndon,* 900 F.2d 804, 807 (5th Cir.), *cert. denied,* 498 U.S. 908, 111 S.Ct. 279, 112 L.Ed.2d 233 (1990); *Angel v. City of Fairfield,* 793 F.2d 737, 739 (5th Cir.1986); *Elliott v. Perez,* 751 F.2d 1472, 1482 (5th Cir.1985). Thus, for Chacko to recover, she must establish that the defendants deprived her of a right guaranteed by the Constitution or laws of the United States. *See Baker v. McCollan,* 443 U.S. 137, 139, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979); *Thomas v. Sams,* 734 F.2d 185, 191 (5th Cir.1984), *cert. denied,* 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985). Chacko must also prove that the alleged constitutional or statutory deprivation was intentional or due to deliberate indifference—not the result of mere negligence. *See Farmer v. Brennan,* 511 U.S. 825, 833–35, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994); *Davidson v. Cannon,* 474 U.S. 344, 348, 106 S.Ct. 668, 670–71, 88 L.Ed.2d 677 (1986); *Daniels,* 474 U.S. at 328, 106 S.Ct. at 662–63; *Estelle v. Gamble,* 429 U.S. 97, 105, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976).

The defendants maintain that Chacko has not suffered a rights deprivation cognizable under § 1983, or, in the alternative, they are entitled to qualified immunity for their actions.

#### 1. *Due Process under the Fourteenth Amendment*

Chacko claims her right to due process under the Fourteenth Amendment was violated because she was deprived of her property interest in continued employment at TAMU. The defendants, however, assert that

Chacko was never hired and, therefore, was not entitled to due process, which arises in connection with the termination of employment.

In order to prevail on a due process claim, Chacko must demonstrate that she had a constitutionally protected property interest in her continued employment by TAMU. *See Brown v. City of Galveston,* 870 F.Supp. 155, 158 (S.D.Tex.1994) (citing *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972)). "The underlying conception of a 'property' interest is 'to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined.'" *Shawgo v. Spradlin,* 701 F.2d 470, 475 (5th Cir.), *cert. denied,* 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 345 (1983) (quoting *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709). To have such an interest in a benefit, a person "must have more than an abstract need or desire for it" or "a unilateral expectation of it." *Id.* at n. 2. Rather, she must have a "legitimate claim of entitlement to it." *Id.* "A plaintiff asserting a substantive due process claim in the public employment context must demonstrate that [s]he had a clearly established property interest in h[er] employment." *Youngblood v. City of Galveston,* 920 F.Supp. 103, 105 (S.D.Tex.1996); *see also Schultea v. Wood,* 27 F.3d 1112, 1116 (5th Cir.1994).

It is well established that property interests are created and defined by state law, not the Constitution. *See Bishop v. Wood,* 426 U.S. 341, 345, 96 S.Ct. 2074, 2077–78, 48 L.Ed.2d 684 (1976); *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709; *Williams v. Texas Tech Univ. Health Sciences Ctr.,* 6 F.3d 290, 293 (5th Cir.1993), *cert. denied,* 510 U.S. 1194, 114 S.Ct. 1301, 127 L.Ed.2d 652 (1994); *Henderson v. Sotelo,* 761 F.2d 1093, 1096 (5th Cir.1985). "These property rights can be created by state statute, local ordinance, written contract, or mutually explicit understandings enforceable under state law as express or implied contracts." *Brown,* 870 F.Supp. at 158–59 (citing *Johnson v. Southwest Miss. Reg'l Med. Ctr.,* 878 F.2d 856, 858 (5th Cir.1989); *Irby v. Sullivan,* 737 F.2d 1418, 1421 (5th Cir.1984)). Texas courts have long recognized that, absent a specific contract term, statutory prohibition, or public policy consideration to the contrary, employment relationships are terminable at will by either party. *See Schroeder v. Texas Iron Works, Inc.,* 813 S.W.2d 483, 489 (Tex.1991); *Winters v. Houston Chronicle Pub. Co.,* 795 S.W.2d 723, 724 (Tex.1990); *East Line & R.R.R. Co. v. Scott,* 72 Tex. 70, 10 S.W. 99, 102 (1888); *see also Zimmerman v. H.E. Butt Grocery Co.,* 932 F.2d 469, 471 (5th Cir.), *cert. denied,* 502 U.S. 984, 112 S.Ct. 591, 116 L.Ed.2d 615 (1991); *Manning v. Upjohn Co.,* 862 F.2d 545, 547 (5th Cir.1989).

Texas also follows the general rule, however, that hiring an individual at a stated sum for a specific term is definite employment for the period named and may not be arbitrarily concluded. *See Winograd v. Willis,* 789 S.W.2d 307, 310 (Tex.App.–Houston [14th Dist.] 1990, writ denied); *Molnar v. Engels, Inc.,* 705 S.W.2d 224, 225 (Tex.App.–San Antonio 1985, writ ref'd n.r.e.); *Dallas Hotel Co. v. Lackey,* 203 S.W.2d 557, 561 (Tex.Civ. App.–Dallas 1947, writ ref'd n.r.e.). "Further, if the term of the contracted employment is intended to exceed beyond one year, the employment contract must be in writing in order to conform to the statute of frauds." *Winograd,* 789 S.W.2d at 310 (citing Tex. Bus. & Com. Code Ann. § 26.01(b)(1)). While a unilateral expectation of continued employment is inadequate, a mutual expectation of continued employment is sufficient to confer a property interest under the Fourteenth Amendment. *See Roth,* 408 U.S. at 577, 92 S.Ct. at 2709; *Evans v. City of Dallas,* 861 F.2d 846, 850 (5th Cir.1988); *Scott v. City of Dallas,* 876 F.Supp. 852, 858 (N.D.Tex.1995); *Snell v. Hidalgo County Water Improvement Dist.,* 507 F.Supp. 834, 836 (S.D.Tex.1981).

In the case at bar, Chacko claims that the record is replete with evidence that she had an employment contract with TAMU. Chacko points to the August 2, 1993, letter from Cook, which states:

Dear Ms. Chacko:

I am pleased to officially offer you the position of Sponsored Student Specialist in the Sponsored Student Programs unit in International Student Services. As we discussed, your duties will include providing

administrative support for sponsored students, assisting in admissions and program development procedures, and monitoring students' progress and budgets to ensure compliance with contractual guidelines. I believe your educational background, international experience, language abilities, and professional attitude will be a valuable asset to this office.

As per our discussion, the salary for this position is $23,120.00 a year, and will commence on October 1, 1993. The period of employment will be for three years.

I look forward to working with you as a member of the International Student Services department, and particularly as a member of the Sponsored Student Programs team.

Copies of this letter were sent to Droleskey and Sands.

■ The defendants argue, however, that Cook's letter did not give rise to an employment contract because Cook did not have the authority to hire Chacko or to establish an employment relationship with TAMU. The defendants contend that Droleskey had the ultimate authority to hire Chacko and that any offer of employment was contingent upon her recommendation. The defendants claim that Chacko did not receive Droleskey's recommendation for employment. The defendants correctly point out that an offer of employment that is contingent upon the recommendation of another cannot form an employment contract. *See McMillan v. Rust College, Inc.*, 710 F.2d 1112, 1117 (5th Cir. 1983). Cook, however, may at least have had ostensible or apparent authority to bind TAMU. In Texas, the leading case on apparent authority explains:

> The doctrine of apparent authority is based on estoppel, and one seeking to charge a principal through the apparent authority of an agent to bind the principal must prove such conduct on the part of the principal as would lead a reasonably prudent person, using diligence and discretion, to suppose that the agent has the authority he purports to exercise....

*Elliott v. Great Nat'l Life Ins. Co.*, 611 S.W.2d 620, 622 (Tex.1981) (quoting *Chastain v. Cooper & Reed*, 152 Tex. 322, 257 S.W.2d

422, 427 (1953)); *accord Wyndham Hotel Co. v. Self*, 893 S.W.2d 630, 633–34 (Tex.App.–Corpus Christi 1994, writ denied). Moreover, although Droleskey claims not to have given Cook the authority to write the letter, Droleskey's actions subsequent to the August 2 letter could be deemed a ratification of Cook's actions. "Ratification may either be express or implied from a course of conduct. Silence which misleads the other party to the transaction to h[er] detriment may constitute such course of conduct." *Diamond Paint Co. v. Embry*, 525 S.W.2d 529, 535 (Tex.Civ. App.–Houston [14th Dist.] 1975, writ ref'd n.r.e.).

At deposition, Cook stated that in early July, she and Droleskey met with Chacko, and Droleskey offered Chacko the position. Moreover, as Chacko points out, on August 11, 1993, Droleskey wrote to the Assistant Provost, through Ashworth, seeking to increase the salary level of the Sponsored Student Specialist position in order to comply with Immigration regulations for the hiring of a foreign national. Droleskey concluded her letter stating:

> The search for a suitable candidate has been in progress since October 1992, and we feel very confident that the present candidate, Ms. Jane Chaco (sic), will make an excellent addition to our staff. Therefore, I will appreciate an expeditious review and approval of this request.

There would have been no need to increase the salary if Droleskey had not selected Chacko for the position. Next, on August 27, 1993, Droleskey executed an INS Return Transportation Statement in her capacity as Chacko's employer agreeing to pay the reasonable cost of Chacko's return transportation if she was terminated before the end of the period of authorized admission, which was three years. At the end of the letter, Droleskey stated: "As the employer of the above-referenced H–1B beneficiary, this regulation will be complied with as stated above."

Additionally, on August 27, 1993, Sands wrote a letter to the INS in support of TAMU's H–1B petition on behalf of Chacko. In Sands's letter, she informed the INS that Chacko "... will begin this new position in

October 1993." Furthermore, in preparation for Chacko's October 1 start date, Droleskey's secretary, Mary Anne Wolff ("Wolff"), provided Chacko with the standard employee information sheet, which Chacko completed and returned, and also accepted Chacko's written authorization for the direct deposit of her TAMU paychecks. In addition, a memorandum found in Droleskey's files documenting her November 12, 1993, meeting with Prescott and Sands notes:

> Ms. Prescott indicated that, due to the letter offering employment, Ms. Chacko really is an employee of TAMU, she just hasn't filled out on campus paperwork. Ms. Sands agreed.

Now, the defendants claim that they were merely in the hiring process and were only attempting to make it possible for Chacko to be eligible for the position. The defendants further argue, without citation to authority, that Chacko's agreement to participate in the interviewing process nullified her property right. The defendants' conduct, however, after the interview process suggests the existence of a mutual understanding that Chacko was to be hired a second time. At deposition, Cook stated that she and Droleskey independently ranked Chacko as the number one candidate. In addition, Cook was asked:

> Q: Then what did you and Ms. Droleskey decide to do?
> A. Ms. Droleskey and I decided what we would do is that I would call Jane and tell her that she was successful in being the No. 1 person and that Ms. Droleskey would make the announcement at the Monday morning meeting or Wednesday meeting. I can't remember which day because we meet every other day in the office of a morning meeting with all the staff.
>
> So whatever day it was that we completed our interview. I believe it was on Monday when I called Ms. Chacko to say that she had ranked No. 1 and that Suzanne was going to make the announcement on Wednesday of that week or whatever day it was.
>
> Q: What did you tell her in addition to her ranking No. 1?
> A: Congratulations.
> Q: That she had a job?

A: Yes.

In her affidavit and deposition testimony, Chacko confirmed that Cook called her on November 8, 1993, and told her she would begin work on November 10, 1993. In addition, Chacko asserts that on November 8, 1993, she met with Droleskey, at which time Droleskey congratulated her on getting the position.

In sum, genuine issues of material fact exist as to whether Chacko was hired by TAMU and, consequently, whether she had a property interest in her continued employment. Therefore, Chacko's due process claim under § 1983 survives summary judgment, unless the defendants establish an affirmative defense.

### 2. Equal Protection under the Fourteenth Amendment

Chacko further claims that the defendants denied her equal protection under the laws in violation of § 1983. The defendants, however, contend that Chacko cannot pursue her equal protection claim because it is based on the same grounds as her Title VII claim. *See Jackson v. City of Atlanta,* 73 F.3d 60, 63 (5th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 70, 136 L.Ed.2d 30 (1996); *accord Irby,* 737 F.2d at 1428–30.

In *Jackson,* the Fifth Circuit held that Title VII provided the plaintiff's sole remedy for race discrimination, as his putative § 1983 claim arose from precisely the same allegedly discriminatory acts as did his Title VII claim. *See* 73 F.3d at 63. The court explained:

> Congress intended for Title VII—with its own substantive requirements, procedural rules, and remedies—to be the exclusive means by which an employee may pursue a discrimination claim. Allowing a plaintiff to state a discrimination claim under § 1983 as well would enable him to sidestep the detailed and specific provisions of Title VII.

*Id.* A plaintiff, however, can "pursue a remedy under § 1983 as well as under Title VII when the employer's conduct violates both Title VII and a separate *constitutional or statutory right.*" *See id.* at n. 13 (emphasis

in original) (citing *Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1573 (5th Cir.1989), *cert. denied*, 493 U.S. 1019, 110 S.Ct. 718, 107 L.Ed.2d 738 (1990)); *accord Wilson v. UT Health Ctr.*, 973 F.2d 1263, 1268 (5th Cir.1992), *cert. denied*, 507 U.S. 1004, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993). In *Jackson*, the plaintiff failed to identify a separate constitutional or statutory right, alleging racial discrimination under Title VII as the sole basis for his § 1983 claim. *See* 73 F.3d at 63.

In this case, however, Chacko asserted that the defendants' conduct violated the equal protection clause of the Fourteenth Amendment as well as Title VII. Although Chacko's amended complaint relies upon the same background facts, she is not foreclosed from proceeding under § 1983 because she relies on a recognized constitutional right separate and independent from Title VII. Indeed, the defendants do not dispute that discrimination against aliens in employment is prohibited under the Fourteenth Amendment.

In *Johnston*, the Fifth Circuit reasoned:

> Our interpretation of the relationship between Title VII and § 1983 does not disturb our holding in *Irby v. Sullivan*. Although Title VII supplements and overlaps § 1983, it remains an exclusive remedy when a state or local employer violates only Title VII. When, however, unlawful employment practices encroach, not only on rights created by Title VII, but also on rights that are independent of Title VII, Title VII ceases to be exclusive. At this point, § 1983 and Title VII overlap, providing supplemental remedies. All circuit courts that have had occasion to consider the issue have reached the same conclusion. . . .

869 F.2d at 1576 (citations omitted). In *Johnston*, the court held that the employer's conduct violated two independent rights: the plaintiff's right under Title VII to be free from retaliation for testifying at an EEO hearing and his right under the First Amendment to testify freely before the Commissioner's Court. *See id.* The court found that liability was properly imposed on the employer under both Title VII and § 1983.

*See id.* Moreover, Title VII does not provide a remedy for discrimination against the individual defendants in their personal capacities. *See Garcia v. Elf Atochem N. Am.*, 28 F.3d 446, 451 n. 2 (5th Cir.1994); *Grant v. Lone Star Co.*, 21 F.3d 649, 652–53 (5th Cir.), *cert. denied*, 513 U.S. 1015, 115 S.Ct. 574, 130 L.Ed.2d 491 (1994); *Harvey v. Blake*, 913 F.2d 226, 227–28 (5th Cir.1990); *Clanton v. Orleans Parish Sch. Bd.*, 649 F.2d 1084, 1099 (5th Cir.1981).

It is settled law that "an alien is entitled to the shelter of the Equal Protection Clause." *Sugarman v. Dougall*, 413 U.S. 634, 641, 93 S.Ct. 2842, 2847, 37 L.Ed.2d 853 (1973) (citing *Graham*, 403 U.S. at 371, 91 S.Ct. at 1851–52; *Truax v. Raich*, 239 U.S. 33, 39, 36 S.Ct. 7, 9–10, 60 L.Ed. 131 (1915); *Wong Wing v. United States*, 163 U.S. 228, 238, 16 S.Ct. 977, 981, 41 L.Ed. 140 (1896); *Yick Wo*, 118 U.S. at 369, 6 S.Ct. at 1070–71). The Supreme Court has determined that "classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close scrutiny." *Graham*, 403 U.S. at 372, 91 S.Ct. at 1852. "Aliens as a class are a prime example of a 'discrete and insular' minority for whom such heightened judicial solicitude is appropriate." *Id.* (citation omitted). The court noted " 'the power of a state to apply its laws exclusively to its alien inhabitants as a class is confined within narrow limits.' " *Id.* (quoting *Takahashi*, 334 U.S. at 420, 68 S.Ct. at 1143).

The Fifth Circuit, summarizing *Sugarman*, noted that "[e]mployment discrimination based on alienage is generally prohibited by the 14th Amendment. Section 1983 is the statutory vehicle for remedy of 14th Amendment violations." *Ramirez*, 615 F.2d at 168 n. 5 (citing *Sugarman*, 413 U.S. 634, 93 S.Ct. 2842); *see generally Mohamed v. Parks*, 352 F.Supp. 518, 520–21 (D.Mass.1973); *Lopez v. White Plains Hous. Auth.*, 355 F.Supp. 1016, 1025–27 (S.D.N.Y.1972); *Younus v. Shabat*, 336 F.Supp. 1137, 1138–39 (N.D.Ill.1971). The Fifth Circuit has also recognized that "[w]ith classifications of this sort, the classification is subjected to strict scrutiny-it can be upheld only if the classification is 'suitably tailored to serve a compelling state interest.' " *Mahone v. Addicks Util. Dist. of Har-*

*ris County,* 836 F.2d 921, 934 (5th Cir.1988) (quoting *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254–55, 87 L.Ed.2d 313 (1985)). As Chacko points out in her response, the position of Sponsored Student Specialist, which entails assisting foreign students who are attending TAMU, does not involve an important government function or a sensitive area of national security where citizenship requirements might arguably be legitimate. In *Mow Sun Wong v. Hampton,* the Ninth Circuit held that a United States Civil Service Commission regulation barring all noncitizens from federal competitive civil service positions was unconstitutional. *See* 500 F.2d 1031, 1038 & 1040–41 (9th Cir.1974), *aff'd,* 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976). In affirming the Ninth Circuit, the Supreme Court observed, "the court accepted the argument that citizenship might properly be required in positions involving policymaking decisions, or in positions involving national security interests, but the court was unwilling to support an extraordinarily broad exclusion on such narrow shoulders." 426 U.S. at 96, 96 S.Ct. at 1902. Here, no compelling state interest justifies the exclusion of aliens from the position at issue.

In their reply brief, the defendants reurge that Chacko was not terminated due to her lack of citizenship. According to the defendants, violations of TAMU's internal posting procedures and other violations of university procedures occurred in the hiring process. The defendants further assert that claims were made by an ISS staff member concerning possible irregularities in the application procedure. The defendants argue, therefore, that they had the right to investigate irregularities in their hiring procedure to ensure that all persons, whether aliens or citizens of the United States, were treated equally. The defendants contend that, due to the irregularities in the hiring procedure, Droleskey would have taken the same action without regard to whether the irregularities involved an alien or a citizen. Thus, the defendants maintain that Droleskey was not abusing her discretionary power or state authority but was using it to protect the interests of all persons who applied for jobs with TAMU.

Yet, as noted above, Chacko has adduced sufficient evidence from which it could be inferred that her lack of citizenship played a role in either the defendants' decision to terminate her or their failure to hire her. Because genuine issue of material fact exist with respect to the defendants' motivation for their employment decisions with respect to Chacko, in the absence of an affirmative defense, Chacko's equal protection claim may proceed against the individual defendants.

D. *Affirmative Defenses*

1. *Sovereign Immunity*

a. *TAMU*

In her first amended complaint, Chacko's sole claim against TAMU is brought under Title VII, as to which the court has already determined that summary judgment is warranted. To the extent, however, it may appear that Chacko is asserting claims against TAMU under §§ 1981 and 1983, TAMU maintains that it is entitled to sovereign immunity.

"The Eleventh Amendment to the United States Constitution bars suits in federal court by citizens of a state against their own state or a state agency or department." *Delahoussaye v. City of New Iberia,* 937 F.2d 144, 146 (5th Cir.1991).[3] As the Fifth Circuit stated in *Clay v. Texas Women's Univ.:*

> The eleventh amendment clearly interposes a jurisdictional bar to suits against a state by private parties who seek monetary relief from the state in the form of compensatory damages, punitive damages, or monetary awards in the nature of equitable restitution, and also to suits against a state or state agency or state official when the monied award is to be paid from the state treasury.

728 F.2d 714, 715 (5th Cir.1984).

It is well settled that "a waiver of sovereign immunity must be specific and ex-

3. The Eleventh Amendment specifically states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

plicit and cannot be implied by construction of an ambiguous statute." *Petterway v. Veterans Admin. Hosp.*, 495 F.2d 1223, 1225 n. 3 (5th Cir.1974); *accord Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984); *Idoux v. Lamar Univ. Sys.*, 817 F.Supp. 637, 641 (E.D.Tex.1993). "Waiver may be found only where the waiver is express or the inference of waiver is overwhelming." *Id.* Neither § 1981 nor § 1983 contains a congressional waiver of a state's eleventh amendment immunity. *See Quern v. Jordan*, 440 U.S. 332, 342, 99 S.Ct. 1139, 1145–46, 59 L.Ed.2d 358 (1979); *Laxey v. Louisiana Bd. of Trustees*, 22 F.3d 621, 623 (5th Cir.1994); *Clay*, 728 F.2d at 716; *Sessions v. Rusk State Hosp.*, 648 F.2d 1066, 1069 (5th Cir.1981); *Penn v. Schlesinger*, 490 F.2d 700, 703 (5th Cir.1973), *rev'd on other grounds*, 497 F.2d 970 (5th Cir.1974), *cert. denied*, 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976); *Petterway*, 495 F.2d at 1225 n. 3; *Idoux*, 817 F.Supp. at 641–43; *Taylor v. Federal Home Loan Bank Bd.*, 661 F.Supp. 1341, 1344 (N.D.Tex.1986); *Zentgraf v. Texas A & M Univ.*, 492 F.Supp. 265, 271 (S.D.Tex.1980). Consequently, it is apparent that Congress did not intend to abrogate a state's eleventh amendment immunity under these statutes.

"Whether the state is the real party in interest is a question of federal law, but to make that determination, this court 'must examine the powers, characteristics and relationships created by state law....'" *Moreno v. Texas Southern Univ.*, 573 F.Supp. 73, 74 (S.D.Tex.1983) (quoting *Hander v. San Jacinto Jr. College*, 519 F.2d 273, 279 (5th Cir.1975)). With respect to a university, "[t]he Fifth Circuit has developed the following list of factors to use when conducting this inquiry: 1) the status of the university under state law; 2) the degree of state control over the university; and 3) the extent to which a money judgment against the university would interfere with the fiscal autonomy of the state." *Idoux*, 817 F.Supp. at 640–41 (citing *Lewis v. Midwestern State Univ.*, 837 F.2d 197, 198 (5th Cir.), *cert. denied*, 488 U.S. 849, 109 S.Ct. 129, 102 L.Ed.2d 102 (1988); *United Carolina Bank v. Board of Regents*, 665 F.2d 553, 557 (5th Cir.1982)). Thus, depending on its status under state law and

its relationship to state government, a public university may qualify for immunity. *See Laxey*, 22 F.3d at 623.

With regard to the status of TAMU under state law, the Texas Education Code classifies TAMU as a "general academic teaching institution" and a "public senior college or university." Tex.Educ.Code Ann. § 61.003(3)–(4). As such, TAMU is considered an agency of the state. *See Idoux*, 817 F.Supp. at 640 (citing Tex.Rev.Civ.Stat.Ann. art 6252–9b, § 2(8)(B); *Lewis*, 837 F.2d at 198; *United Carolina Bank*, 665 F.2d at 557). In *Zentgraf*, the court analyzed the relationship of TAMU and the State of Texas and found that TAMU was an "alter ego of the State of Texas." 492 F.Supp. at 271–73. "[C]ourts have consistently held that the general academic teaching institutions and public senior colleges and universities of this state are part of the state." *Idoux*, 817 F.Supp. at 640 (citing *Lewis*, 837 F.2d at 199; *United Carolina Bank*, 665 F.2d at 561; *Clay*, 728 F.2d at 715; *Jagnandan v. Giles*, 538 F.2d 1166, 1174–76 (5th Cir.1976), *cert. denied*, 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1083 (1977); *Moreno*, 573 F.Supp. at 74–76; *Zentgraf*, 492 F.Supp. at 272; *Hart v. University of Tex.*, 474 F.Supp. 465, 466–67 (1979); *Henry v. Texas Tech Univ.*, 466 F.Supp. 141, 146 (N.D.Tex.1979)). Because TAMU is an alter ego of the State of Texas, it is accorded sovereign immunity, and Chacko may not maintain suit against it in federal court under § 1981 or § 1983.

### b. *Individual Defendants*

The Supreme Court also has construed the Eleventh Amendment as barring suits under §§ 1981 and 1983 against officials so closely affiliated with a state as to make the state the real party in interest. *See Zentgraf*, 492 F.Supp. at 271 (citing *Quern*, 440 U.S. at 342, 99 S.Ct. at 1145–46; *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S.Ct. 3057, 3057–58, 57 L.Ed.2d 1114 (1978); *Edelman v. Jordan*, 415 U.S. 651, 663–64, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974); *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)). "Suits against state officials in their official capacity therefore should be treated as suits against the State." *Hafer v. Melo*, 502 U.S.

21, 24, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991); *see Wallace,* 80 F.3d at 1047 n. 3. Thus, "[w]here it is apparent that the state is the real defendant in interest to a suit and that any monetary award against a state official would be satisfied by state funds, the suit is barred by the Eleventh Amendment." *Zentgraf,* 492 F.Supp. at 271 (citing *Edelman,* 415 U.S. at 663–64, 94 S.Ct. at 1355–56; *Jagnandan,* 538 F.2d at 1173–74); *accord Delahoussaye,* 937 F.2d at 147.

In her first amended complaint under the section entitled "parties," Chacko has sued the individual defendants in their official and personal capacities. Under her claims for relief, however, she asserts that she seeks damages from the individual defendants in their personal capacities. To the extent that it may appear Chacko is seeking monetary awards from the individual defendants in their official capacities under §§ 1981 and 1983, those claims are barred by the Eleventh Amendment.

### 2. *Qualified Immunity*

 With respect to Chacko's claims against the individual defendants in their personal capacities, the defendants assert that they are entitled to qualified immunity. Under the doctrine of qualified immunity, government officials performing discretionary functions are shielded from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see Salas v. Carpenter,* 980 F.2d 299, 305–06 (5th Cir. 1992). Qualified immunity is available to defendant officials in suits arising under §§ 1981 and 1983 and must be pled as an affirmative defense. *See Siegert v. Gilley,* 500 U.S. 226, 231, 111 S.Ct. 1789, 1792–93, 114 L.Ed.2d 277 (1991); *Harlow,* 457 U.S. at 816, 102 S.Ct. at 2737; *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923–24, 64 L.Ed.2d 572 (1980); *Todd v. Hawk,* 72 F.3d 443, 445 n. 7 (5th Cir.1995); *Wicks v. Mississippi State Employment Servs.,* 41 F.3d 991, 996 n. 21 (5th Cir.1995). It is an immunity from suit, extending beyond a defense to liability to include all aspects of civil litigation, including discovery. *See Jacquez v. Procunier,* 801 F.2d 789, 791 (5th Cir.1986); *see also Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815–16, 86 L.Ed.2d 411 (1985).

When determining whether qualified immunity is available, the actions of a reasonably competent official are assessed in the light of the legal rules that were clearly established at the time the action was taken. *See Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738; *Mitchell,* 472 U.S. at 530, 105 S.Ct. at 2817–18; *Mangieri v. Clifton,* 29 F.3d 1012, 1016 (5th Cir.1994); *Bennett v. City of Grand Prairie,* 883 F.2d 400, 408 (5th Cir.1989). A legal right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right. *See Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039; *Hale v. Townley,* 45 F.3d 914, 919 (5th Cir. 1995); *Foster v. City of Lake Jackson,* 28 F.3d 425, 429 (5th Cir.1994); *Bennett,* 883 F.2d at 408.

 A party seeking damages from an official asserting qualified immunity bears the burden of overcoming that defense. *See United States v. Burzynski Cancer Research Inst.,* 819 F.2d 1301, 1310 (5th Cir.1987), *cert. denied,* 484 U.S. 1065, 108 S.Ct. 1026, 98 L.Ed.2d 990 (1988); *Saldana v. Garza,* 684 F.2d 1159, 1163 (5th Cir.1982), *cert. denied,* 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 481 (1983). In order to defeat an official's assertion of qualified immunity, a plaintiff must show that: (1) the plaintiff has asserted a violation of a constitutional right; (2) this right was clearly established at the time of the official's actions; and (3) the official's actions were objectively unreasonable. *See Eugene v. Alief Indep. Sch. Dist.,* 65 F.3d 1299, 1305 (5th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1680, 134 L.Ed.2d 782 (1996). Stated alternatively, it must be determined (1) whether the plaintiff has alleged a violation of a clearly established constitutional right under currently applicable constitutional standards, and (2) if the officer's conduct was unconstitutional, whether it was nevertheless objectively reasonable in light of

judicial precedent at the time of the infraction. *See Kelly v. Foti,* 77 F.3d 819, 821 (5th Cir.1996).

■ The plaintiff must show that the official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff. *See Harlow,* 457 U.S. at 816, 102 S.Ct. at 2737; *Schultea,* 47 F.3d at 1431; *see also Eugene,* 65 F.3d at 1305. The plaintiff must set forth facts underlying the claim, not mere conclusions, before public officials may be subject to trial or to pretrial discovery in a § 1983 case. *See Schultea,* 47 F.3d at 1430, 1434; *Jacquez,* 801 F.2d at 791; *Elliott,* 751 F.2d at 1478. The same standards apply to state officials asserting the defense of qualified immunity with respect to claims brought under § 1981. *See Todd,* 72 F.3d at 445; *Wicks,* 41 F.3d at 996 n. 21.

■ As discussed above, Chacko has demonstrated the existence of a clearly established right to be free from discrimination on the basis of her citizenship under §§ 1981 and 1983. To defeat an assertion of qualified immunity, Chacko must also show that the defendants' conduct was not objectively reasonable in light of the law at the time of the conduct. *See Kiser v. Garrett,* 67 F.3d 1166, 1170 (5th Cir.1995) (citing *Pfannstiel v. City of Marion,* 918 F.2d 1178, 1185 (5th Cir. 1990)); *Blackburn v. City of Marshall,* 42 F.3d 925, 931 (5th Cir.1995); *Duckett v. City of Cedar Park,* 950 F.2d 272, 279 (5th Cir. 1992). In 1993, when the events occurred, Droleskey was aware that discrimination against aliens in employment was prohibited. In fact, Droleskey testified at deposition:

Q: You are aware, are you not, that it is a violation to not hire Ms. Chacko if she was the most qualified person for the job, all other things being equal?

Put it this way. You're aware that it is illegal to not hire a non-citizen if that person is the most qualified person for the position or to otherwise discriminate against a non-citizen?

A: Oh, absolutely. I know it's illegal to discriminate against somebody just on the basis of citizenship, definitely.

Q: Or non-citizenship?

A: On the basis of citizenship, period.

Q: Or national origin?

A: Yes. And race and ethnic origin and— Yes.

Q: And if any aspect of Ms. Chacko's not being hired were related to her not being a United States citizen, that would be wrong?

A: If it was, yes, it would be wrong.

In light of this testimony and established law at the time of the alleged infraction, Droleskey is not entitled to qualified immunity, as her actions were objectively unreasonable, if it is determined that Chacko was terminated or was not hired due to her citizenship.

As to Ashworth, the defendants claim that she acted within her discretionary authority when she affirmed Droleskey's decision to initiate an investigation and defer the hiring process. The defendants argue, "Since Plaintiff's allegations rests [sic] upon the hiring process for this specialist position, and Ashworth played no role in the interviewing or the hiring process, Plaintiff's charges against Ashworth in her individual capacity sh[ould] be dismissed with prejudice." Contrary to this assertion, Chacko alleges in ¶ 14 that "... Defendant Droleskey, with the concurrence of Defendant Ashworth, fired the Plaintiff, once again in response to a complaint that Plaintiff was not a United States citizen." In addition, in ¶ 16, Chacko claims that "... Defendants Gage, Cocanougher and Ashworth participated in the decision to terminate the Plaintiff from her employment and/or refused to reinstate the Plaintiff after they were advised that she was terminated because she was not a citizen of the United States." At Ashworth's deposition, she confirmed that it was her decision that Chacko was not going to be employed at TAMU.

Q: In the process that you indicated you were the one who decided to stop the process.

And when you say "stop the process" does that mean that you decided to terminate any further job related work for the plaintiff in this case?

A: Yes.

Q: To terminate her or to indicate to her that she was not to report for work?

A: To terminate—"Termination" is not the right word. We just stopped the hiring process.

Q: Okay. By whatever method you want to refer to it, it meant that she was not going to be allowed to go to work for Texas A & M University as an employee?

A: She wasn't even hired at that point.

Q: I understand. But that's what I'm saying is that she was not going to be employed at Texas A & M University for whatever reasons?

A: Yes.

Q: Now, that decision was a decision made by yourself?

A: Yes.

Q: And/or did Ms. Droleskey have anything to do with it?

A: I was the one who made the decision.

From Chacko's first amended complaint and Ashworth's deposition testimony, it is apparent that Ashworth's role included making the decision either to stop the hiring process, as the defendants contend, or to discharge Chacko, as Chacko maintains. In light of established judicial precedent, Ashworth's conduct was not objectively reasonable, if it is determined that Chacko was terminated or was not hired because of her status as an alien. Hence, qualified immunity is not available to Ashworth as to Chacko's §§ 1981 and 1983 claims.

■ With regard to Cocanougher, Chacko alleges in ¶ 16 of her first amended complaint that Cocanougher participated in the decision to terminate her and refused to reinstate her after he was advised that she was terminated on the basis of her citizenship. Cocanougher's only involvement appears to stem from a meeting with Chacko and Prescott, an attorney representing TAMU. Chacko alleges that she showed Cocanougher her contract and other documents and explained the situation. According to Chacko, she was interrogated by Prescott, and, at the conclusion of the meeting, Cocanougher promised to call her, but he never did. According to Cocanougher, he deferred judgment regarding this situation to Droles-

key, Ashworth, and legal counsel. Taking into consideration Cocanougher's limited role and lack of involvement in the hiring/termination decision, as well as his deference to counsel, who presumably was more knowledgeable in the area of employment discrimination, his actions were objectively reasonable. Hence, Cocanougher is entitled to qualified immunity.

■ Finally, the defendants maintain that Gage is protected by qualified immunity, as he had no knowledge of Chacko's allegations. Attached to the defendants' motion for summary judgment as Exhibit "D" are Gage's unrefuted answers to Chacko's first set of interrogatories. Gage was asked and responded as follows:

INTERROGATORY # 1: Identify all persons who have knowledge of facts relevant to this cause, and for each such person so identified, state the general area of that person's knowledge.

ANSWER: Defendant did not handle nor was involved in this case and does not know who these persons are.

\* \* \* \* \* \*

INTERROGATORY # 5: State whether you participated in any conversation concerning the Plaintiff or the 1993 vacancy in the position of Sponsored Student Specialist. . . .

ANSWER: Defendant does not recollect participating in any such conversation.

INTERROGATORY # 6: Identify all documents that discuss or refer to the decision not to hire or permit Plaintiff to be employed in the position of Sponsored Student Specialist.

ANSWER: Defendant does not have any of these documents and did not see any of them.

INTERROGATORY # 7: State whether any agent or employee of Texas A & M University ever conducted an investigation into Plaintiff's allegation regarding her not being employed as the Sponsored Student Specialist. . . .

ANSWER: Defendant does not have any of this information and believes that it

would have been reviewed in the appropriate unit of the University.

By affidavit, Chacko merely alleges that she wrote a letter to Gage to which she received no response and, subsequently, attempted to discuss her situation with Gage, but was instructed to meet with Cocanougher instead. In the absence of any additional facts, Gage appears to have had no personal involvement or knowledge of the hiring/termination decision. Under these circumstances, Chacko has not shown his actions to be objectively unreasonable. Accordingly, Gage is entitled to invoke the defense of qualified immunity.

### III. *Conclusion*

There are no outstanding issues of material fact with respect to Chacko's Title VII claim against TAMU, and, to the extent she seeks damages against TAMU under §§ 1981 and 1983, TAMU is entitled to sovereign immunity. Defendants Gage, Cocanougher, Ashworth, and Droleskey are also entitled to sovereign immunity with respect to Chacko's §§ 1981 and 1983 claims against them in their official capacities. Further, defendants Gage and Cocanougher are entitled to qualified immunity from Chacko's §§ 1981 and 1983 claims against them in their individual capacities. Accordingly, summary judgment is GRANTED as to these claims.

With regard to Chacko's §§ 1981 and 1983 claims against Ashworth and Droleskey in their individual capacities, there exist outstanding issues of material fact which preclude summary judgment. Therefore, summary judgment on these claims is DENIED.

IT IS SO ORDERED.